INDIANA & MICHIGAN ELECTRIC COMPANY *v.* JACK STEVENSON, JOE COLLINS, LLOYD COLLINS.

[No: 1-776A121. Filed June 15, 1977. Rehearing denied July 25, 1977. Transfer denied November 30, 1977.]

*Thomas W. Yoder, Lawrence A. Levy, Livingston, Dildine, Haynie & Yoder,* of Fort Wayne, *John M. Baumunk,* of Brazil, for appellant.

*George N. Craig,* of Brazil, *Hansford C. Mann, Mann, Mann, Chaney, Johnson & Hicks,* of Terre Haute, for appellees.

## NATURE OF THE CASE

LOWDERMILK, J.—Defendant-appellant, Indiana & Michigan Electric Company (IMEC), appeals from the adverse judgments of the trial court entered upon jury verdicts which awarded plaintiffs-appellees, Joe and Lloyd Collins (Collins), compensatory damages of $120 and punitive damages of $60,-000, and which awarded plaintiff-appellee, Jack Stevenson (Stevenson), compensatory damages of $300 and punitive damages of $50,000. These two cases were consolidated for purposes of this appeal.

## FACTS

The facts necessary for our disposition of this appeal are as follows: IMEC is a public utility engaged in the generation and transmission of electric energy. IMEC has the power of eminent domain.[1]

In October, 1974, IMEC was examining and surveying land in Clay County, Indiana, in preparation for the construction of its proposed Breed-Tipton-Pipe-Creek 765,000 volt electrical transmission facility.

The Collins and Stevenson were residents and landowners in Clay County whose property IMEC wished to survey.

When IMEC's survey crew reached the Collins' land they found corn 10 to 12 feet high in the line of sight of their survey routes. IMEC ran what are known as centerlines from a tripod when conducting its surveys. Inasmuch as the Collins'

---

1. IC 1971, 32-11-3-1 (Burns Code Ed.).

corn was in its line of sight for approximately 1800 feet of the survey route, IMEC cut the corn without first obtaining the Collins' permission.

On Stevenson's land there was a woods consisting of brush, saplings, trees and dense foliage along approximately 1100 feet of IMEC's survey route. In order to obtain what it believed to be an accurate line of sight and tower elevations IMEC cut approximately 23 saplings and trees without Stevenson's permission.

## CENTRAL ISSUES

1. Whether a public utility when examining and surveying property preparatory to condemning the property has the right to cut the corn or trees of a landowner, without his permission, when thought necessary to conduct an accurate survey.

2. Whether there was sufficient evidence to merit an award of punitive damages, and whether the trial court erred in overruling IMEC'S motions for judgments on the evidence at the close of the Collins and Stevenson cases.

3. Whether the trial court erred in permitting certain irrelevant evidence to be introduced over IMEC's objection in both cases.

4. Whether the trial court erred in denying IMEC's motion for a change of venue in the Stevenson case.

5. Whether the trial court erred in giving, and in refusing to give, certain instructions to the jury.

6. Whether the verdicts awarding punitive damages in both cases are arbitrary and capricious.

## DISCUSSION AND DECISION

ISSUE ONE

Before reaching the merits of this appeal we first will address the appellees' argument that IMEC has waived all speci-

fications of error by not setting out each assignment of error individually in the argument section of its brief. .

IMEC elected to group its numerous specific assignments of error under several general headings, supported by a single argument, as permitted by Ind. Rules of Procedure, Appellate Rule 8.3 (A) (7). Under each general assignment of error IMEC numerically directed this court to where in its motion to correct errors the specific error could be located, and by the use of footnotes, where in the record the alleged error was committed and preserved for appellate review.

It is the opinion of this court that AP. 8.3 (A) (7) has been substantially complied with. As stated in the recent case of *Indiana State Board of Tax Commissioners* v. *Lyon and Greenleaf Co., Inc.* (1977), 172 Ind. App. 272, 359 N.E.2d 931, at p. 933:

> "Before turning to a discussion of the merits, it is necessary to dispose of a contention by appellee that the issues to be discussed have been waived by the Board. Appellee contends that appellant has waived all asserted errors by failing to specifically set forth in its brief with the respective arguments the applicable errors assigned in its motion to correct errors. However, several specifications of error are grouped and the issues raised by such errors are sufficiently articulated. Moreover, each section of appellant's argument is prefaced with a statement making numerical reference to which specifications of error from the motion to correct errors relate to each section of argument. Where there has been substantial compliance with the rules, a failure to include all that is technically required will not result in a waiver. *Yerkes* v. *Washington Manufacturing Co., Inc.* (1975), [163] Ind. App. [692], 326 N.E.2d 629."

IC 1971, 32-11-1-1 (Burns 1976 Supp.) provides in pertinent part as follows:

> "Entry, survey, effort to purchase, title.—Any person, corporation or other body having the right to exercise the power of eminent domain for any public use, under any statute, existing or hereafter passed, and desiring to exercise such power, shall do so only in the manner provided in this chapter [32-11-1-1—32-11-1-13] except as otherwise

provided herein. *Before proceeding to condemn, such person, corporation or other body may enter upon any land for the purpose of examining and surveying the property sought to be appropriated or right sought to be acquired;* and shall make an effort to purchase for the use intended such lands, right-of-way, easement or other interest therein or other property or right. . . ." (Our emphasis)

IMEC contends that as an incident to its right to enter and survey property prior to it being condemned it has the right to cut minimal quantities of crops or timber in order to produce an accurate survey. The Collins and Stevenson contend that such conduct on the part of IMEC would allow an unconstitutional "taking" of their property in violation of Art. I, § 21 of the Indiana Constitution, impliedly revoking IMEC's statutory license to enter private property, and thereby making it a trespasser.

Art. I, § 21 of the Indiana Constitution provides:

"Compensation for services or property.—No man's particular services shall be demanded, without just compensation. No man's property shall be taken by law, without just compensation; nor, except in case of the State, without such compensation first assessed and tendered."

We are thus faced with the unenviable task of reconciling two important and oftentimes competing interests. On the one hand we have the interest of the landowner to be secure in the ownership and possession of his property; on the other hand, we have the interest of society as a whole who in our technologically advanced civilization have become accustomed at the mere flick of a switch to be provided with a valuable source of energy—*electricity*.

We must now proceed with the difficult task of balancing these two important interests.

In the first instance our legislature by vesting the right of eminent domain in specific entities has recognized that the desires of the individual landowner(s) to the undisturbed enjoyment of his property must succumb to the practical needs of society as a whole. *State* v.

*Flamme* (1940), 217 Ind. 149, 26 N.E.2d 917. Further, our legislature has provided that any entity preparing to exercise its statutory right of eminent domain has the further right to enter, examine and survey the property about to be condemned. IC 32-11-1-1, *supra.* It is the generally accepted rule that a public utility's mere entry upon land for the purposes of examination and survey pursuant to a statutory grant of authority does not *ipso facto* amount to a *taking* of property in the constitutional sense for which compensation must be assessed and tendered before the entry and survey are made. 29 A.L.R.3d 1004 (1970). We fully adhere to this rule. Properly exercised the pre-condemnation survey can serve the interests of both landowner and public utility. The landowner will have ony so much of his land condemned as is needed for the particular utility purpose involved; and, the utility will not be forced to engage in the wasteful expenditure of the ratepayer's money by blindly purchasing a "pig in a poke."

However, a public utility's right to enter private property for the purpose of examination and survey confers no license to engage in a course of destruction of crops, timber, etc.

Having recognized the competing interests involved and the two extremes of the spectrum our focal point becomes narrowed to this question, "When do acts by a public utility when conducting an examination and survey of property prior to condemning that property amount to a *taking* of private property in violation of Art. I, § 21 of the Indiana Constitution, thereby revoking a public utility's statutory license to enter private property?"

Our Supreme Court has not had occasion to address this specific question. However, in the case of *School Town of Andrews* v. *Heiney* (1912), 178 Ind. 1, 7, 98 N.E. 628, a "taking" of property was defined at p. 630 as follows:

"What is a taking of property within the constitutional provision is not always clear; but, so far as general rules are permissible of declaration on the subject, it may be

said that there is a taking where the act involves an actual interference with, or disturbance of, property rights, *which are not merely consequential, or incidental injuries to property, or property rights,* as distinguished from prohibition of use, or enjoyment, or destruction of interests in property . . ." (Our emphasis)

See also, *Schuch* v. *State* (1968), 251 Ind. 403, 241 N.E.2d 362.

Therefore, before private property is "taken" in a constitutional sense there must be a *substantial interference* with the owners use and enjoyment of the specific property allegedly taken. Whether the interference is substantial is a factual question which must be resolved in each case by the trier of fact.

IMEC contends that by not allowing utilities to cut a minimum number of trees, crops, etc., needed to effectuate accurate surveys, it will become in essence impossible to conduct surveys, and without surveys, there can be no eminent domain. It is argued that any entry upon a person's property will result in some damage. IMEC posits the extreme example of blades of grass being trampled under the feet of the survey crew.

We do not accept the total picture of oblivion which IMEC paints for utilities in such broad strokes for two reasons. First, there was expert testimony presented at trial from which reasonable men could find that methods of surveying through cornfields and timber were available which would not result in the destruction of corn and trees. For example, the experts posited offset surveying and surveying from platformed elevations as practical alternatives to cutting. The costs in money and time in adopting these techniques must yield at this point to the paramount interests of the landowner. Secondly, the law does not concern itself with trifling injuries. Such an injury as posited by IMEC could not properly be considered a substantial interference with the owners use and enjoyment of his property. In the same vein would be the case of a utility driving survey stakes into land. The land could not properly be considered substantially interfered with and thereby taken.

We think it important to emphasize that a taking in the constitutional sense is a relative term and that not all *damage* to property amounts to a *taking* of that property. For example, to cut a tree down at its base would be a taking of that tree; however, reasonable men might well find that to cut a limb or branch from a tree does not amount to a taking of the tree. The reason being that the owners use and enjoyment of the tree would not be substantially interfered with.

In the case at bar reasonable men could have found that IMEC's cutting of a strip of corn 1800 feet long, 4 to 8 feet wide, substantially interfered with the Collins free use and enjoyment of their corn. *Indiana & Michigan Electric Co.* v. *Stevenson* (1975), 166 Ind. App. 517, 337 N.E.2d 150. Likewise, IMEC's cutting of approximately 23 saplings and trees on Stevenson's property was a substantial interference with his free use and enjoyment of his saplings and trees. *Indiana & Michigan Electric Co.* v. *Stevenson, supra.*

ISSUE TWO

IMEC contends that the trial court erred in overruling its motions for judgments on the evidence at the close of the Collins and Stevenson cases, and that the evidence was insufficient to merit an award of punitive damages in either case.

The Collins and Stevenson contend that the evidence and reasonable inferences therefrom establish that IMEC exceeded the lawful scope of its statutory authority to conduct examinations and surveys by cutting trees and crops and thereby became trespassers; hence, if the actions of IMEC as trespassers could have been considered malicious an award of punitive damages was proper.

As this court has stated, *supra,* reasonable men could have found that IMEC's conduct in cutting the Collins' corn and Stevenson's trees amounted to a taking of that property for which compensation should have been first assessed and tendered. IMEC's unconstitutional tak-

ing of private property revoked its statutory grant of authority to enter private property for the purposes of examination and survey and thereby relegated IMEC to the status of a trespasser, *Burton* v. *Calaway* (1863), 20 Ind. 469; *Spades* v. *Murray* (1891), 2 Ind. App. 401, 28 N.E. 709. It is settled that an award of punitive damages is proper in a trespass action upon a showing of fraud, malice or oppressive conduct. *Moore* v. *Crase* (1873), 43 Ind. 30; *Nicholson's Mobile Home Sales, Inc.* v. *Schramm* (1975), 164 Ind. App. 598, 330 N.E.2d 785. As noted above, there was evidence that there were alternative means of surveying available which would have resulted in slight, if any, damage to corn or trees. The jury could have reasonably inferred that IMEC had knowledge of these alternative methods of surveying property, but elected not to use them because of the additional time and expense involved, hence, IMEC's actions exhibited a heedless disregard for the property rights of landowners.

Therefore, it is the opinion of this court that the trial court did not err in denying IMEC's motions for a judgment on the evidence in the Collins and Stevenson cases, and there was sufficient evidence to merit an award of punitive damages in both cases. *Mamula* v. *Ford Motor Co.* (1971), 150 Ind. App. 179, 275 N.E.2d 849; *Hidden Valley Lake Inc.* v. *Kersey* (1976), 169 Ind. App. 339, 348 N.E.2d 674.

ISSUE THREE

IMEC contends that the trial court erred in pemitting nonparties to testify concerning the activities of IMEC upon their land, in permitting evidence into the record concerning IMEC's negotiations with landowners looking forward to the acquisition of voluntary easements, and in allowing certain pleadings to be read to the jury. It is contended that this evidence was not relevant or material to the issues before the trial court.

It is the opinion of this court that the trial court did not abuse its discretion in permitting certain non-party witnesses

to testify about IMEC's surveying activities upon their property.

The Collins and Stevenson sought to recover punitive damages in their compaint. Their right to recover such damages was conditioned upon their ability to prove IMEC perpetrated an established tort in the performance of its surveying activities, or conduct which could properly be characterized as tortious in nature or malicious. *Vernon Fire & Casualty Insurance Co.* v. *Sharp* (1976), 264 Ind. 599, 349 N.E.2d 173.

Evidence of IMEC's course of conduct in dealing with landowners along its proposed survey route would have some relevance as tending to prove whether IMEC's conduct upon the Collins' and Stevenson's lands was malicious in nature and thereby deserving of an assessment of punitive damages. 12 I.L.E. *Evidence* § 55, pps. 491-492.

We are not unmindful that the Collins' and Stevenson's proof of these collateral matters was time-consuming and arguably prejudicial to IMEC.

Nevertheless, it was the function of the trial court to weigh the relevancy of this evidence against its possible prejudice to IMEC and its risk of confusing the jury, and its determination favoring admissibility will not be overturned absent a clear showing of abuse of discretion.

IMEC contends that evidence of its acquisition of easements in non-related cases, as well as certain pleadings filed in cases between the parties herein, were improperly admitted into evidence.

This evidence was admitted for the purpose of informing the jury, under the theory of the Collins' and Stevenson's complaints, that the conduct of IMEC was malicious and oppressive and thus entitled them to an award of punitive damages. Further, we hold that if this were error that it was harmless error as there was other evidence properly admitted which

would have justified an award of punitive damages. Ind. Rules of Procedure, Trial Rule 61.

## ISSUE FOUR

IMEC argues that the trial court erred in the Stevenson case by not granting its motion for a change of venue from the county.

The Stevenson case commenced on February 12, 1976. In the evening edition of the "Brazil, Indiana Times", on February 12, 1976, there appeared an article outlining the Collins' verdict of $60,000 punitive damages which concluded:

". . . The Collins decision is expected to serve as the precedent in the remaining cases."

IMEC filed its petition for a change of venue from the county on February 16, 1976, which as denied on February 19, 1976.

TR. 76 provides in pertinent part as follows:

### "CHANGE OF VENUE

(1) In all cases where the venue of a civil action may now be changed from the judge or the county, such change shall be granted upon the filing of an unverified application or motion without specifically stating the ground therefor by a party or his attorney. Provided, however, a party shall be entitled to only one [1] change from the county and only one [1] change from the judge.

(2) In any action except criminal no change of judge or change of venue from the county shall be granted except within the time herein provided. Any such application for a change of judge or change of venue shall be filed not later than ten [10] days after the issues are first closed on the merits.

\* \* \*

(8) Provided, however, if the moving party first obtains knowledge of the cause for change of venue from the county or judge after the time above limited, he may file said application, which must be verified personally by the party himself, specifically alleging when the cause was first discovered how discovered, the facts showing the grounds for a change, and why such cause could not have been discovered before by the exercise of due diligence. Any opposing party shall

have the right to file counter-affidavits on such issue within ten [10] days, *and the ruling of the court may be reviewd only for abuse of discretion.*

     * * ** " (Our emphasis)

The newspaper article complained of was located on page eight of the "Brazil, Indiana Times", and consisted of six sentences. The article related certain factual matter about the Collins case to the reader, and concluded with the author's speculation that the Collins case woud serve as a precedent for the Stevenson case.

There being no showing of prejudice to such a degree that it became unlikely that IMEC could obtain a fair trial in Clay County, the trial court did not abuse its discretion in denying IMEC's motion for a change of venue from the county.

ISSUE FIVE

IMEC makes numerous assignments of error in the trial court's giving, and in its refusal to give, certain instructions to the jury. We will not belabor this opinion by setting each of these instructions out in full followed by a separate discussion. We have examined each of the complained of instructions individually, and in relation to each other, and are of the opinion that the jury was adequately instructed on the law.

ISSUE SIX

IMEC contends that the verdict in the Collins case awarding $60,000 punitive damages, and in the Stevenson case awarding $50,000 punitive damages is clearly excessive.

On appeal, this court will not reverse an award of damages as being excessive unless the damages appear so unreasonable as to convince this court that the jury was motivated by passion or prejudice. *City of Evansville v. Cook* (1974), 162 Ind. App. 465, 319 N.E.2d 874.

IMEC, in more than one place in its brief, argues that a verdict awarding punitive damages must bear some reasonable relationship to the compensatory damages suffered. IMEC tendered an instruction to this effect which was refused by the trial court.

We agree with IMEC's argument as far as it goes, but we are of the opinion that IMEC's statement of the law is incomplete.

It has been often stated that a high ratio of punitive damages to compensatory damages alone will not be grounds to reverse an award of punitive damages. *Joseph Schlitz Brewing Co.* v. *Central Beverage Co.* (1977), 172 Ind. App. 81, 359 N.E.2d 566; *Lou Leventhal Auto Co.* v. *Munns* (1975), 164 Ind. App. 368, 328 N.E.2d 734. The purpose of an award of punitive damages is to punish the wrongdoer and thereby deter others from engaging in similar conduct in the future. *Joseph Schlitz Brewing Co., supra.*

Therefore, from what has been said thus far, it appears to this court that there are two primary factors which should properly be considered in reviewing an award of punitive damages. First, the nature of the tort and the extent of the actual damages sustained should be considered. Second, the economic wealth of the defendant should be considered.

In the Collins case actual damages were $120, and in the Stevenson case actual damages were $300. In both cases the tort being complained of was a trespass. Actual compensatory damages being small, and the tort being complained of resulting in direct injury to property rather than injury to the person, are both factors which would mitigate in favor of a punitive damage award smaller than arrived at by the juries in the cases at bar. However, on the other hand, we have the economic wealth and income of IMEC to consider.

The record reveals that IMEC at the close of 1974 had consolidated assets totaling $1,544,638,000; it paid $40,320,000

dividends on its common stock, and its year end income totaled $43,924,000. These factors, properly considered, would tend to favor a large punitive damage award.

Therefore, upon balancing the actual damages sustained by the Collins and Stevenson with the nature of the tort which they suffered on the one hand, against the economic wealth of IMEC on the other, this court is unable to say that the verdicts in the Collins and Stevenson cases were the result of passion or prejudice.

Judgments affirmed.

Robertson, C.J. and Lybrook, J., concur.

NOTE.—Reported at 363 N.E.2d 1254.