**RIVERSIDE INSURANCE CO.,**
**Appellant (Defendant Below),**

v.

**Roger D. PEDIGO and Linda I. Pedigo,**
**Appellees (Plaintiffs Below).**

**No. 2–1279A378.**

Court of Appeals of Indiana,
Fourth District.

Jan. 20, 1982.
Rehearing Denied March 10, 1982.

Thomas J. McKeon, John R. Hiner, Osborn & Hiner, Indianapolis, for appellant.

Michael J. Stapleton, Ball, Eggleston, Bumbleburg & McBride, Lafayette, for appellees.

MILLER, Presiding Judge.

Appellant-defendant, Riverside Insurance Company, is appealing from a jury verdict against it for $51,000 in compensatory damages and $50,000 in punitive damages. The award was based on Riverside's failure to pay, pursuant to its policy, for damages sustained by Roger D. Pedigo and Linda I. Pedigo, husband and wife, when their home was totally destroyed by fire.

The issues raised by Riverside on appeal concern:

1) the failure of the trial court to instruct the jury specifically on Riverside's defense of fraud and false swearing;

2) with respect to compensatory damages, an erroneous instruction on actual cash value, the proper measure of damages for personal property, and sufficiency of the evidence regarding the value of the lost realty and personalty;

3) sufficiency of the evidence to permit an instruction on, and the award of punitive damages; and

4) the admissibility of an exhibit showing Riverside's net worth.

Finally Riverside also claims error with respect to objectionable and improper comments made by the Pedigos' counsel in final argument. For the reasons which follow we affirm.

## FACTS

In 1972 the Pedigos purchased a 50-to-100-year-old farmhouse for $9,900. The farmhouse and its contents, both of which were insured by Riverside, were destroyed by fire on February 22, 1978. The policy limits were $30,000 for the house, $15,000 for unscheduled personal property and $6,000 for additional living expenses.

At the time of the fire the exterior of the house was in a state of disrepair and decay; however, the Pedigos had renovated portions of the interior, principally the kitchen. The record is silent with respect to the value of the renovations.

On March 6, 1978, Riverside's adjuster recommended to the company that it set aside a reserve for the policy limits on the house and its contents, and a reserve for ⅔ of the policy limit on additional living expenses. Unknown to the Pedigos, Riverside began an arson investigation in mid-March regarding the fire. From March to July, 1978 the Pedigos submitted several claims to Riverside in an effort to recoup their losses in accordance with the policy. Riverside rejected the claims, each time citing alleged technical defects in the proof of loss forms. Perceiving they were making no headway in dealing directly with Riverside, the Pedigos filed suit and the case was tried before a jury.

Riverside's conduct in processing the Pedigos' claim was sharply disputed at trial. The dispute is set out in some detail below at the discussion on the punitive damages

issue. The only evidence in the record with respect to the value of the farmhouse is testimony by a contractor that at the time of the fire it would have cost approximately $46,000 to replace the farmhouse with a new house of the same or similar dimensions using the least expensive materials available. Riverside did not object to this testimony at trial on the grounds that replacement cost is an erroneous measure of damages for determining the "actual cash value" of real estate in a total loss case. The evidence with respect to the value of the personal property lost in the fire consisted of a written property inventory and a valuation statement made by Riverside's adjuster. The inventory asserted the personal property had a value in excess of $25,000. The adjuster's valuation statement was that the Pedigos' personal property loss exceeded the policy's $15,000 limit.

The jury returned a verdict of $51,000 in compensatory damages and $50,000 in punitive damages. The trial court entered judgment accordingly plus interest on the compensatory damages in the amount of 8% from the date of loss until the day judgment was entered. The Pedigos agreed to a remittitur of $4,400 because the evidence only showed a $1,600 loss for additional living expenses.

*Issue One: Instruction on False Swearing*

■ Riverside contends the trial court erred in not instructing the jury as to its defense of "Fraud and False Swearing ... Willful Concealment and/or Misrepresentation of Material Facts" (hereafter referred to as false swearing).

The trial court's entry on instructions reveals, as conceded by Riverside on appeal, that Riverside withdrew its detailed false swearing instruction (Defendant's proposed final instruction No. 4) and merely by oral suggestion to the court requested a modified instruction as follows:

"Mr. Bovey [counsel for Riverside]: Your Honor, the defendant also would respectfully direct the Court's attention to the defendant's other affirmative defense as set forth in defendant's proposed final jury instruction No. 4. [previously withdrawn] [t]he defense of fraud and false swearing, willful concealment, and/or misrepresentation of material facts. I would like to suggest a few modifications to that proposed instruction."

The court responded:

"Court: Mr. Bovey, I think we're just out of time, that instruction is so long, and there were so many things I found at fault in that, that it's just going to take too much time to get that corrected. I'm not going to consider any thing further on that."

Because Riverside failed to tender a modified instruction, we have no idea what modifications it was proposing. Consequently there is nothing on this record to review concerning a "modified" false swearing instruction. Having tendered and then having withdrawn this instruction, Riverside is in the same position it would have been had it never tendered the instruction—without an issue on appeal. *Anderson v. Taylor*, (1972) 154 Ind.App. 217, 289 N.E.2d 781.

The trial court did generally instruct the jury on Riverside's defense of false swearing.[1] However, on appeal, Riverside con-

1. Riverside's jury instruction No. 1 as modified and given by the trial court provided in relevant part:

"Secondly, it is the Defendant's theory that the Plaintiffs' claims under the policy sued upon are also barred for the reason that Plaintiffs violated the following policy condition which states:

Concealment, fraud

This entire policy shall be void if, whether before or after a loss, the insured has willfully concealed or misrepresented any material fact or circumstance concerning this insurance or the subject thereof, or the interest of the insured therein, or in the case of any fraud or false swearing by the insured relating thereto."

Another final instruction (the Pedigos' instruction No. 10) relating to misrepresentation, and not claimed to be erroneous on appeal, stated in part:

"You are instructed that an insurer may not rely on a misrepresentation by the insured to avoid liability on an insurance policy unless the fact misrepresented was material."

Also, the trial court's preliminary instruction No. 2 provided in part:

tends that despite its failure to tender an instruction, the trial court's failure to instruct the jury in detail as to the specific legal meaning of fraud and false swearing constitutes error.

Although not mentioned by Riverside in either its initial brief or reply brief, a proper discussion of the trial court's affirmative duty to instruct the jury would begin with Ind. Rules of Procedure, Trial Rule 51(B) which provides: "After argument the judge shall instruct the jury as to the law upon the issues presented by the evidence. Such instructions given by the court of its own motion shall be in writing when any party so requests. This request must be made before the commencement of the argument." Basically, the rule describes when final instructions are given and what they encompass. The rule is silent, however, with respect to the nature of the trial court's duty to instruct the jury. Case law on this issue is sparse; however, in *Universal C.I.T. Credit Corp. v. Shepler*, (1975) 164 Ind.App. 516, 329 N.E.2d 620, Judge Garrard, in his concurring opinion, analyzed the rule as follows:

"Prior to adoption of the new rules of civil procedure, it was said that such an affirmative duty existed as to general but not as to special instructions. However, no Indiana case ever really defined those terms. This appears to have occurred for two reasons. It appears to have been generally presumed that the court must have given proper general instructions. See, 2 Gavit: Indiana Pleading & Practice §§ 392, 393. Secondly, at a very early date, the Supreme Court decided that no error was available on appeal addressed to the court's failure to instruct (assuming the affirmative obligation existed) unless the appellant raised the issue by specific objection or exception before the instructions were delivered to the jury. *Krack v. Wolf* (1872), 39 Ind. 88.

The commission comments indicate that the prior law was intended to apply under TR.51(B). Thus, whatever the obligation of the court may be in a particular case, it seems clear that at least where the issue in question is not specifically called to the court's attention and some objection made on the record to the failure of the court to instruct the jury on that issue, no error is preserved for appeal. Since C.I.T. made no such objection at the trial, it has waived any error that might have thus occurred. Having so ruled, I am nevertheless constrained to emphasize my opinion that it is the function and responsibility of the trial court in the first instance to insure that its jury is properly instructed on the law applicable to the issues in the case. See, *Wolff v. Slusher* (1974), 161 Ind.App. 182, 314 N.E.2d 758."

*Id.* at 528–29, 329 N.E.2d at 627–28. We agree with Judge Garrard's analysis of the rule and find that because the trial court in the instant case gave the jury general instructions on the defense of fraud and false swearing, the trial court discharged whatever affirmative duty, if any, it had on the issue. Furthermore, Riverside's failure to object to the absence of a special false swearing instruction when the case went to the jury constitutes a waiver of the issue on appeal. Finally, were we to construe Riverside's modification request as an objection to the effect that the instructions which the trial court was going to give were incomplete because they did not include a specific definition of false swearing, the objection would fail. If a party desires an instruction containing a more detailed statement of the law, that party is required to tender such an instruction. *Thornton v. Pender*, (1978) 268 Ind. 540, 553, 377 N.E.2d 613, 622; *City of Terre Haute v. Deckard*, (1962) 243 Ind. 289, 297, 183 N.E.2d 815, 819. Having failed to tender a "complete" instruction on false swearing, Riverside cannot now complain about the general language contained in the instructions given on that subject.

"the defendants . . . allege:
(b) Plaintiffs made willful misrepresentations and concealments of material facts and made false swearings as to the cause of the

fire and as to the actual value of the extent of their losses; and other facts and circumstances surrounding the fire and their insurance."

*Issue Two: Compensatory Damages*

The loss payable clause in the insurance policy states:

"[t]his Company . . . to an amount not exceeding the amount(s) herein specified, does insure the Insured . . . to the extent of the actual cash value of the property at the time of loss, but not exceeding the amount which it would cost to repair or replace the property with material of like kind and quality within a reasonable time after such loss . . . against all DIRECT LOSS BY FIRE . . . ." (Emphasis in original.)

The phrase "actual cash value" is not defined anywhere in the policy, and the parties have disputed its meaning.

## A. *Instruction on Actual Cash Value*

█ Riverside contends the trial court erred in giving the Pedigos' tendered instruction on actual cash value which read: "The phrase 'actual cash value' does not mean purchase price minus depreciation but rather means the amount of money within the policy limit, sufficient to restore, repair, or replace property destroyed."

Although Riverside correctly challenges the general proposition stated in the instruction that replacement value is equivalent to actual cash value,[2] its argument in this regard fails to acknowledge that under the terms of the Pedigos' policy, the cost of new property to replace that which was damaged is an alternative measure of damages where such cost does not *exceed* market value. In *General Outdoor Advertising Co., Inc. v. LaSalle Realty Corp.*, (1966) 141 Ind.App. 247, 218 N.E.2d 141, Judge Hunter, in addressing a question similar to that before us involving several alternative measures of damages, concluded that when the party with the initial burden of proof (here the Pedigos) presents evidence under one of the possible theories of damages, the obligation then shifts to the other party (Riverside) to show that an alternative measure is more appropriate. The Court there noted, "[w]here the plaintiff submits only evidence of the cost of restoration, it is incumbent on the defendant to show that the 'before and after' test is less." *Id.* at 269, 218 N.E.2d at 152. As Judge Hunter aptly observed, "it would seem strange to require a party to carry the burden of proof as to a fact which might be adverse to his cause." *Id.*

In the instant case, Riverside does not argue the cost of replacement exceeds market value, nor does the record indicate it made any effort to establish the market value of the Pedigos' property. Thus, although the challenged instruction may be construed as permitting the jury to consider the replacement cost of *new* property as being synonymous with market value, under the evidence presented in this case and under the alternative measure of damages expressed in the unambiguous language of the Pedigos' policy, the jury was entitled to award damages based on replacement cost and it was not misled by the instruction in that respect.

We further note that under the evidence, Riverside's witness, Lintner, was asked to explain the meaning of the measure of damages as it appeared in the insurance policy. He stated the Pedigos were entitled to the market value or the replacement cost, but not the cost of replacement *new*. He explained that in his opinion, the replacement cost was the amount necessary to put the Pedigos in the same position they were in before the fire, i.e., to restore the property with property of like kind and quality. Thus, Riverside's own witness indicated that replacement cost under the policy was somewhat synonymous to market

---

**2.** *See Atlas Constr. Co., Inc. v. Indiana Ins. Co. Inc.*, (1974) 160 Ind.App. 33, 40, n.2, 309 N.E.2d 810, 814, n. 2, where this Court observed " 'actual cash value' as used in a fire insurance policy is synonymous with 'fair market value' . . . and is not consistent with 'replacement cost.' " The Court in *Atlas* suggested, however, that replacement cost may be one of several acceptable methods of appraising real estate. *See State Highway Comm'n v. Jones*, (1977) Ind.App., 363 N.E.2d 1018, where the Court noted the current cost of reproducing the property, less depreciation, is, like the market data and income approaches, a proper method of valuation.

value. In this regard, arguably, the instruction was incomplete in not specifying that replacement cost did not mean the cost of replacement with new property. To preserve any allegation of error, however, Riverside had the duty to submit a more complete instruction. *E.g., In re Beck's Estate*, (1968) 143 Ind.App. 291, 240 N.E.2d 88.

Finally, we also note the significant fact that Riverside's objection at trial and in its Motion to Correct Errors suggested, without any elaboration as to the allegedly proper measure of damages, that the instruction was erroneous because it permitted the jury to consider the cost of replacing lost *personal property* with new property, thus conferring a benefit upon the Pedigos by placing them in a better position as a result of the fire. For the first time in its appellate brief, Riverside contends the correct measure of damages as regards personal property is neither actual cash value (market value) nor replacement cost not to exceed actual cash value—the two measures specified by the Pedigos' policy.[3] Citing cases from other jurisdictions, Riverside suggests the correct measure of damages is instead the value to the owner of the personal property, not including any mere sentimental or fanciful attachment he may have.[4] Whatever may be the merits of such an argument where, as here, the policy in question established actual cash value *and* replacement cost as the appropriate measures of damages, we conclude Riverside has failed to preserve any error on appeal in light of the fact the record reveals it presented no evidence on its theory, nor did it tender an appropriate instruction. *E.g., Rieth-Riley Construction Co., Inc. v. McCarrell*, (1975) 163 Ind.App. 613, 325 N.E.2d 844.

## B. *Evidence Supporting Valuation of Personal Property*

Next Riverside argues the evidence with respect to the value of the Pedigos' personal property is insufficient to support the verdict because the evidence is allegedly based on speculation and guesswork.

The record in this regard consists of "Property Inventory" forms which were completed by the Pedigos and submitted to Riverside, and which were introduced into evidence by Riverside. The inventory is a catalog of items of personal property which the Pedigos allegedly lost in the fire, and it lists the individual items, their original cost, and the date and place of purchase. At trial Riverside attempted to rebut the reliability of the valuations in the inventory by pointing out that there was no indication of the date and place of purchase with respect to several items, and that the list contained items which were not claimed on a prior inventory which the Pedigos had submitted to Riverside.

Additionally, the valuation evidence regarding the lost personalty shows that Riverside's claims' manager in Lafayette, Mr. Lintner, informed the Pedigos that their personal property loss exceeded the policy limits. Lintner had 9 and ½ years' experience as an insurance adjuster and as an adjuster he had regularly ascertained the amount of damage to property. Although Lintner was not a "professional appraiser," he had been trained in estimating fire damage in accordance with standards in the insurance industry. Several days after the fire, Lintner went to the fire site and observed the ruins. Subse-

---

3. Interestingly, Riverside's own instruction on damages given by the trial court with some modifications not pertinent here, stated in part:
 "With respect to the contents [of the dwelling], you should determine the fair actual cash value of the property which the Plaintiffs, Roger and Linda Pedigo[,] had actually damaged or lost as a result of the fire."

4. We note such a test has been applied by this Court with respect to converted personal property in the recent opinion in *Cannon v. Northside Transfer Co., Inc.*, (1981) Ind.App., 427 N.E.2d 712. Quoting *Aufderheide v. Fulk*, (1916) 64 Ind.App. 149, 153, 112 N.E. 399, 400, the Court in *Cannon* stated:
 " 'For the loss of such [personal] property so situated and used, the measure of damages in case of conversion is the value to the owner under all the circumstances, based on actual damages sustained by being deprived of his property, not including any mere sentimental or fanciful value he may for any reason, place upon it.' "

quently, Lintner filed a claim brief with Riverside in which he recommended that it set aside a reserve for the policy limits on the house and its contents, and a reserve for two-thirds of the policy limit on additional living expenses.[5] At trial Mrs. Pedigo testified that Lintner informed her the Pedigos' personal property loss exceeded the policy limits. Lintner testified he could not recall making the valuation statement. At the very worst the evidence with respect to the value of the lost personal property was in conflict. In reviewing a jury verdict this Court will not weigh evidence or resolve credibility of witnesses, but rather our inquiry is limited to determining whether the verdict is sustained by substantial evidence of probative value. *Fleetwood Corp. v. Mirich*, (1980) Ind.App., 404 N.E.2d 38; *Montgomery Ward v. Tackett*, (1975) 163 Ind. App. 211, 323 N.E.2d 242. Here, the evidence that Lintner made the valuation statement was corroborated by the claim brief. Furthermore, Lintner's valuation statement and recommendation that a reserve be set aside for the personal property in the amount of $15,000 are competent evidence of the property's valuation. We conclude, therefore, there was substantial evidence from which the jury could have reasonably determined the value of the lost personal property. Thus, the jury's verdict was not based on speculation or guesswork. Riverside's argument regarding the reliability of the valuations in the Pedigos' property inventory is to no avail because the valuation statement is sufficient evidence to support the verdict. We will not reweigh evidence. *Fleetwood Corp. v. Mirich, supra.*

C. *Evidence Supporting Valuation of Dwelling*

■ Riverside also contends on appeal that the verdict is contrary to the weight of the evidence with respect to the valuation of the farmhouse because the Pedigos failed to show the farmhouse's fair market value immediately prior to the fire. Riverside

argues the proper measure of damages regarding the actual cash value of real estate in a total loss case is fair market value immediately prior to the loss.

Significantly, however, in the course of its objection to the Pedigos' instruction on actual cash value Riverside informed the trial court "[t]he dwelling was, in fact, insured for replacement value" under the policy. This comment apparently referred to the theory under which this case was tried. Most significant in this regard, the Pedigos' Instruction No. 6 concerning compensation in the event liability were resolved in their favor stated, in part, "[y]ou may consider: 1) The replacement value of the dwelling." Riverside did not object to this language. It became the law of the case. *E.g., State v. Hall*, (1981) Ind.App., 415 N.E.2d 89 (opinion on petition for rehearing).

Evidence in the record supporting the jury's verdict based on replacement value is testimony by a knowledgeable building contractor that at the time of the fire it would have cost approximately $46,000 to replace the farmhouse with a new house of the same or similar dimensions using the least expensive materials available. Accordingly, the jury's verdict based on the cost of replacement was not error.

*Issue Three: Punitive Damages*

Riverside contends the punitive damages verdict is both contrary to law and contrary to the evidence, and contends the trial court erred in giving the jury the following instruction on punitive damages:

"If you find from a preponderance of the evidence and under the Court's instructions that the defendant was guilty of willfully injuring plaintiffs by (1) deciding not to accept proof of loss in advance of filing the same by the plaintiffs, and/or (2) thwarting plaintiffs' attempts to process their insurance claim, and/or (4) [sic] misleading plaintiffs as to the reasons of denying the claim for their insurance benefits, and/or [sic] and if you

5. Riverside has not contended Lintner was acting outside his scope of authority so as to prevent his actions and statements from being binding upon Riverside as admissions. *See* *Burger Man, Inc. v. Jordan Paper Products, Inc.*, (1976) 170 Ind.App. 295, 352 N.E.2d 821; *Mutual Benefit Life Ins. Co. v. Cannon*, (1874) 48 Ind. 264.

find that this conduct was willful, oppressive, malicious or with heedless disregard of the consequences, and as a result thereof, Roger and Linda Pedigo were damaged, and if you further find that Roger and Linda Pedigo are entitled to recover compensatory or actual damages you may also allow the plaintiffs to recover exemplary or punitive damages as well.

Exemplary damages are damages allowed as punishment by way of example and to deter others from committing a like act. If you allow exemplary damages, they may be in such amount as you find sufficient to punish the defendant for its conduct and to act so as to be a deterrent to others."

At trial Riverside objected to the instruction on the ground there was no evidence in the record of tortious conduct which would support a verdict on punitive damages. Specifically, Riverside maintained that its conduct with respect to the processing of the Pedigos' claim could not be found to be willful, oppressive, malicious or done with heedless disregard of the consequences because the evidence showed that its conduct was part of a good faith arson investigation. Riverside makes the same argument on appeal, and concludes that the punitive damages verdict is contrary to law.

 Since Riverside's argument with respect to the instruction presents a question of sufficiency of the evidence, we first note the well settled law concerning the appellate standard of review. Our function is not to sit as a trial court, but rather to review and correct errors of law and to accept the facts as they are presented so long as probative evidence supports them. *Melloh v. Gladis*, (1974) 261 Ind. 647, 309 N.E.2d 433. In reviewing a jury verdict this Court will not weigh evidence or resolve credibility of witnesses but rather our inquiry is limited to determining whether the verdict is sustained by substantial evidence of probative value. *Fleetwood Corp. v. Mirich, supra; Montgomery Ward v. Tackett, supra.* Only when the evidence is without conflict and leads to but one conclusion and the fact finder has reached a

contrary conclusion will we disturb the decision as being contrary to law. *Thompson v. Lee,* (1980) Ind.App., 402 N.E.2d 1309.

 In Indiana punitive damages are not ordinarily recoverable in cases involving a breach of contract. *Vernon Fire & Casualty Ins. Co. v. Sharp,* (1976) 264 Ind. 599, 349 N.E.2d 173; *Monte Carlo, Inc. v. Wilcox,* (1979) Ind.App., 390 N.E.2d 673; *Travelers Indemnity Co. v. Armstrong,* (1979) Ind.App., 384 N.E.2d 607 (transfer pending). However, in *Vernon* our Supreme Court enunciated the two exceptions to the general rule: 1) punitive damages may be awarded "where the conduct of the breaching party not only amounts to a breach of the contract, but also *independently* establishes the elements of a common law tort such as fraud," 2) alternatively, punitive damages may be awarded in the absence of an independent tort if "it appears from the evidence as a whole that a serious wrong, tortious in nature, has been committed, but the wrong does not conveniently fit the confines of a predetermined tort." *Vernon Fire & Cas. Ins. Co. v. Sharp, supra* at 608, 349 N.E.2d at 180. The Supreme Court defined the second exception as one where " 'the elements of fraud, malice, gross negligence or oppression *mingle* in the controversy.' " *Id.* at 609, 349 N.E.2d at 180, *quoting Taber v. Hutson,* (1854) 5 Ind. 322, 324. Additionally, before punitive damages may be awarded under either exception, it must appear that the public interest will be served by the deterrent effect punitive damages will have upon future conduct of the wrongdoer and parties similarly situated. *Hibschman Pontiac, Inc. v. Batchelor,* (1977) 266 Ind. 310, 314, 362 N.E.2d 845, 848.

In *Vernon,* the insurance company, while conceding liability to the insured for a sum certain for fire loss, refused to pay the claim until it had settled an employee's claim. The Supreme Court upheld the award of punitive damages but noted that punitive damages will not lie where an insurance company merely causes an insured to seek a judicial determination on the question of liability provided that the con-

tract is reasonably susceptible to more than one interpretation. The Court commented:

"Appellants acknowledge the foregoing rule allowing punitive damages, but maintain that their conduct in dealing with their insured reflects nothing more than a legitimate exercise of an insurer's 'right to disagree' as to the amount of recovery, citing *Meridian Insurance Co. v. McMullen*, (1972) 152 Ind.App., 141, 282 N.E.2d 558. It is evident that the exercise of this right may directly result in the intentional infliction of temporal damage, including the damage of the interference with an insured's business (which an insured will undoubtedly consider to be oppressive). The infliction of this damage has generally been regarded as privileged, and not compensable, for the simple reason that it is worth more to society than it costs, i.e., *the insurer is permitted to dispute its liability in good faith because of the prohibitive social costs of a rule which would make claims nondisputable.* Insurance companies burdened with such liability would either close their doors or increase premium rates to the point where only the rich could afford insurance.

For these reasons, we agree that an insurer cannot be subjected to a punitive damage award for seeking *in good faith* to pay only the amount which the law requires to be paid under its contract. Insofar as defendants' conduct is ascribable to their good faith efforts to pay the legal proceeds, their conduct is privileged." (Emphasis added.)

*Vernon Fire & Cas. Ins. Co. v. Sharp, supra* at 609–10, 349 N.E.2d at 181.

*Hoosier Ins. Co., Inc. v. Mangino,* (1981) Ind.App., 419 N.E.2d 978, is a fire insurance case in which the facts resemble—but are distinguishable from—the evidence in the case at bar. In that case, an explosion preceded the fire after which flames appeared immediately throughout the house, a gasoline container was found near the site of the fire, and the area smelled of gasoline. The insurer denied the claim by a letter in which it stated, quoting the relevant policy provision, the entire policy

"shall be void if, whether before or after a loss, the insured has wilfully concealed or misrepresented any material fact or circumstance concerning this insurance or the subject thereof, or the interest of the insured therein, or in case of any fraud or false swearing by the insured relating thereto."

*Id.* at 990. On appeal this Court noted the evidence would have been sufficient to support a verdict of arson; however, the jury concluded otherwise, and returned a verdict awarding the insured compensatory and punitive damages. In reviewing the punitive damages verdict the Court found "there was *no* evidence of bad faith dealing or evidence from which bad faith dealing could be inferred by reasonable fact finders." (Emphasis in original.) *Id.* at 987. The Court found further that given the circumstances of the case, the insurer's statement that it would not have to pay the claim did not demonstrate malice or oppressive conduct; nor would the absence of any attempt to help the insured complete the proof of loss forms amount to malice or oppressive conduct. Relying in part on *Vernon Fire & Cas. Ins. Co. v. Sharp, supra,* the *Hoosier* court held that in view of all the evidence, the jury could not have reasonably concluded that elements of fraud, misrepresentation, malice, gross negligence or oppression mingled in the insurer's denial of the insured's claim; consequently, the Court reversed the punitive damages finding as being contrary to law.

By contrast, in *Travelers Indemnity Co. v. Armstrong, supra,* this Court determined, based on facts more similar to those in the case at bar, that the jury was justified in awarding punitive damages for the "oppressive" conduct of the insurance company. In that case, fire caused severe interior damage to the farmhouse owned by the insured. Uncontested was the estimated cost of repair, consisting of materials ($1,688.45), labor ($5,455.61) and profit, overhead and taxes ($1,575.56), which totaled $8,729.62. When informed of that cost, Travelers' claims adjuster offered to pay $6,400 for the repairs, explaining a policy provision

required the reduced offer. Later, by letter, Travelers explained in detail that a 25% across-the-board depreciation factor was incorporated in the policy so as to avoid betterment of the 100-year-old house. Travelers admitted by written interrogatories read into evidence and by testimony there was no such (express) policy provision. On appeal, this Court reasoned as follows:

"This [Travelers'] theory of across-the-board depreciation is outside the bounds of reason and logic. Assuming *arguendo* that the property damaged by fire had diminished in value as a result of age, wear and tear, or inadequate maintenance, that diminution in value would bear no logical relevance to the application of a depreciation factor on the costs of labor, overhead, and taxes included in the estimated repair cost."

*Travelers Indemnity Co. v. Armstrong, supra* at 618. Thus, based on the misrepresentation of a policy provision, this Court held the jury "reasonably could have concluded that the conduct of Travelers was oppressive and indicative of a heedless disregard of the consequences, thus supporting the punitive damages award." *Id.* at 618–19.

Most recently, our Supreme Court dealt with the issue of unreasonable and false representations resulting in prejudicial delays to a consumer in the context of punitive damages in *Art Hill Ford, Inc. v. Callender*, (1981) Ind., 423 N.E.2d 601. *Art Hill* involved an automobile dealer who ultimately took six months to complete repairs on a new truck which the plaintiff had purchased. The dealer had repeatedly informed the plaintiff that the needed parts were unavailable. At trial, however, an expert witness from the truck's manufacturer testified he knew of no shortage of parts during the applicable time. The owner's inquiries concerning the status of repairs on the truck were usually ignored, disregarded by the dealer whose general manager accused the plaintiff of causing a lot of trouble. The evidence also showed the truck was repaired quickly the first time after a call to the manufacturer's dealer/customer service representative, and the truck was repaired the second time within three days after the suit was filed. Finally, there was conflicting evidence about the possible negligent failure of the dealer to check a "transfer case" when the truck was first brought in with a broken axle. On appeal our Supreme Court affirmed the jury's verdict on punitive damages. The Supreme Court stated: "[f]rom this evidence, the jury could reasonably infer that there was not only a breach of warranty of prompt service ... [but also] cogent and convincing proof ... [of] intentional wrongful acts constituting misrepresentation, fraud, gross negligence and oppressive conduct." *Id.* at 604. The dealer in *Art Hill* either knew or should have known the needed parts were available. In any event the dealer "did not make a sincere effort to obtain the needed parts" and thus had no legitimate reason to misstate the true state of affairs regarding the availability of parts. *Id.* The truck owner was obviously prejudiced because he was denied the use of his truck for the greater part of six months.

■ Here, initially we acknowledge the record arguably demonstrates Riverside's suspicions of arson were reasonable. The evidence at trial indicates Riverside first suspected arson when its "zone reinspection" team noticed empty closets in the farmhouse and the presence of peculiar burn patterns on the farmhouse's floor joists. Riverside then hired an independent fire investigator who concluded that the fire was incendiary in origin because in his opinion the fire had multiple origins and because the burn patterns on the floor joists, including the upper floor, indicated the presence of flammable liquids. The evidence also shows that on the day of the fire the appellees left their home at 11:00 A.M. and at 11:20 A.M. their neighbor noticed "quite a bit of light gray or white smoke" coming from the appellees' house. Additionally the record demonstrates that at the time of the fire the appellees were heavily in debt in general, were specifically in arrears in their mortgage payments and in arrears to Sears, Roebuck & Co., and were in the habit of writing "NSF" checks. This

evidence would have been sufficient to support Riverside's arson defense had the jury decided to accept it.[6] Circumstantial evidence is sufficient to establish proof that a fire was incendiary in origin. *Hoosier Ins. Co. Inc. v. Mangino, supra.*

Although Riverside had good reasons to suspect arson, they did not inform the Pedigos of their suspicions or that they were denying the claim on the basis of arson. In fact Riverside led the Pedigos to believe the only problem with their claim was alleged defects in the proof of loss claims which the Pedigos had submitted to Riverside. Moreover, a fair inference from the evidence is that Riverside decided to deny the claim, whether they could prove the Pedigos were arsonists or not, because they thought the Pedigos had deliberately set fire to their house.

Approximately two weeks after the February 22 fire, the Pedigos filed a claim under the policy with Riverside's claims' manager in Lafayette, Mr. Lintner. Lintner rejected the claim for the stated reason the property inventory forms were improperly dated and the forms were not submitted in triplicate. Meanwhile, Riverside hired an independent firm, Systems Engineering (Systems), to investigate the fire. Mr. Pement of Systems investigated the ruins of the fire on March 16, when he took several debris samples for submission to System's lab. On March 20 Pement called Mr. Stinchcomb of Riverside and reported on the March 16 investigation. According to Stinchcomb, Pement informed Stinchcomb "we definitely had an arson case." Stinchcomb phoned Lintner "immediately" and informed Lintner of Pement's news. In April Lintner sent additional blank claim forms to the Pedigos, but brushed off their inquiries regarding completion of the forms. The Pedigos then hired an attorney to assist them with their preparation of claim forms on April 24. On April 22, Pement received permission from Mrs. Pedigo "to investigate the fire and remove any evidence that may point to the cause or origin of the fire." The record does not disclose how Pement identified himself to Mrs. Pedigo, nor is there any evidence that Riverside or Pement informed the Pedigos that Riverside had investigated or was investigating the fire as being incendiary in origin.

On May 2, Lintner sent the Pedigos' attorney a letter which stated Riverside was not "consider[ing] any payment on [the] loss" at that time because "we still have not received a statement in proof of loss signed by your clients." On May 12 Lintner wrote a memorandum to the Pedigo file; the memorandum stated: "Don't accept proof[;] send blank to attorney." On direct examination regarding the memorandum, Lintner volunteered "[o]ur fire investigation was on it [sic] at the time." A fair inference from the memorandum and Lintner's statement is Riverside's stated reasons for denying the claim were pretextual, and deliberately false. The inference of pretext and falsehood is corroborated by the fact Lintner knew of Pement's arson report when Lintner rejected the claim. Subsequently the Pedigos' attorney helped them complete another claim which consisted of a proof of loss statement and a property inventory. The attorney submitted the claim to Lintner on July 10. On August 4 Lintner sent the attorney a letter which stated the proof of loss was insufficient because it "does not state under oath the total amount of insurance and whether any other insurance existed on the property at the time of the fire." At trial Lintner admitted he knew the amount of insurance, and Lintner's March 6 claim brief contained an en-

---

6. However, the record also reveals that the firemen who extinguished the fire removed clothing from the closets and threw it out the window, and that the firemen did not smell any accelerants or flammable liquids. Also, there was testimony that the burn patterns on the lower floors' joists were due to debris falling down through the walls because the walls did not have fire stops. One of the firemen testi- fied the flammable hydrocarbons produce black smoke as opposed to gray or white smoke. Finally, the fire department's investigation of the fire did not show the fire to be of suspicious origin. Had Riverside raised the jury's rejection of Riverside's arson defense on appeal, we would have found the verdict to be supported by substantial evidence of probative value. *Fleetwood v. Mirich, supra.*

try which stated: "Other insurance: none." There is no evidence that Riverside ever changed its March 20 assessment: "we definitely ... [have] an arson case."

From the evidence before it summarized above, the jury could reasonably have concluded that although Riverside secured an opinion at the outset the fire was caused by arson and accordingly decided to deny the Pedigos' claim, it intentionally misrepresented its position to the Pedigos without presenting any evidence at trial which would excuse its misrepresentation and withholding of information. On appeal Riverside states its actions were the result of a desire not "to help perpetrate what appeared to be a fraud upon itself." As a result of the misrepresentation, the Pedigos experienced not only a substantial delay in having their claim honored by Riverside, but also suffered the inconvenience occasioned by unnecessary litigation and their own futile efforts (and, later, those of their attorney) to comply with Riverside's demands. The Pedigos were ultimately able to prove the fire was not caused by arson; however, Riverside's conduct of concealment and delay arguably prejudiced their ability to prove their innocence. Accordingly, it is evident Riverside's actions—involving misrepresentation and concealment by the insurer of an investigation based on perishable physical evidence—were an appropriate basis for the deterrence objectives of punitive damages, and are clearly outside the "right to disagree" rule found in *Vernon Fire & Cas. Ins. Co. v. Sharp, supra* and *Hoosier Ins. Co., Inc. v. Mangino, supra* (where Hoosier Insurance informed the insured it was denying liability under its policy provision pertaining to fraud and false swearing). In part because an insurance company occupies a position of trust with members of the public whom it agrees to indemnify against certain losses, we believe the imposition of punitive damages in the instant case would further the public interest. *See generally F. D. Borkholder Co. v. Sandock,* (1980) Ind., 413 N.E.2d 567; *Art Hill Ford, Inc. v. Callender, supra.*

*Issue Four: Net Worth Exhibit*

Riverside contends the trial court committed reversible error by admitting a copy of the 1978 annual report which Riverside filed with the Indiana Insurance Commissioner. The report showed Riverside's total assets to be in excess of $112,000,000 and its total liabilities to be in excess of $85,000,000.

Riverside's objections at trial were that the report would inflame the jury, serve to try Riverside on the basis of its wealth and not on the merits, and the report was inadmissible because there was insufficient evidence to warrant a punitive damages award.

 ..Generally in cases where an award of punitive damages is justified, evidence of the financial condition of the defendant is admissible and may be considered by the jury in determining the amount of punitive or exemplary damages. · *Herman v. Hess Oil Virgin Islands Corp.,* (3d Cir. 1975) 524 F.2d 767; *Seifert v. Solem,* (7th Cir. 1967) 387 F.2d 925; *Southern Pacific Transp. Co. v. Lueck,* (1975) 111 Ariz. 560, 535 P.2d 599, *after remand,* 112 Ariz. 277, 540 P.2d 1258, *cert. denied,* 425 U.S. 913, 96 S.Ct. 1510, 47 L.Ed.2d 763; *Weisenburg v. Molina,* (1976) 58 Cal.App.3d 478, 129 Cal.Rptr. 813; *Fopay v. Noveroske,* (1975) 31 Ill.App.3d 182, 334 N.E.2d 79; *State ex rel. Kubatzky v. Holt,* (1972) Mo.App., 483 S.W.2d 799; *Belinski v. Goodman,* (1976) 139 N.J.Super. 351, 354 A.2d 92; *Southern Pacific Co. v. Watkins,* (1967) 83 Nev. 471, 435 P.2d 498; 1 Sedgwick on Damages § 385 (9th ed. 1912). Indiana is in accord with the general rule. *Hibschman Pontiac, Inc. v. Batchelor, supra; Atkinson v. VanCleave,* (1900) 25 Ind. App. 508, 57 N.E. 731. In *Hibschman* our Supreme Court, in holding evidence of the defendant's wealth is not *required* to support a verdict of punitive damages, cited with approval *Manning v. Len Immke Buick,* (1971) 28 Ohio App.2d 203, 276 N.E.2d 253, in which the Court of Appeals of Ohio held that "where punitive damages are to be assessed, the wealth of the defendant may be shown so that the jury will assess damages that will punish him."

*Hibschman Pontiac Inc. v. Batchelor, supra* 266 Ind. at 316–17, 362 N.E.2d at 849. Additionally in *Atkinson* the Appellate Court held evidence regarding the value and extent of the defendant's property was admissible in a case where exemplary damages were recoverable for malicious prosecution. *Atkinson v. VanCleave, supra* at 509, 57 N.E. at 732. *See generally Physicians Mutual Ins. Co. v. Savage,* (1973) 156 Ind.App. 283, 296 N.E.2d 165; cited with approval in *Hibschman Pontiac, Inc. v. Batchelor, supra; Joseph Schlitz Brewing Co. v. Central Beverage Co., Inc.,* (1977) 172 Ind.App. 81, 359 N.E.2d 566; *Indiana & Michigan Electric Co. v. Stevenson,* (1977) 173 Ind.App. 329, 363 N.E.2d 1254.

 The relevancy of evidence of the defendant's financial condition in cases where punitive damages are justified lies in the purpose of punitive damages. The purpose of an award of punitive damages is to punish the wrongdoer and thereby deter him and others from similar conduct in the future. *F. D. Borkholder Co., Inc. v. Sandock, supra* at 571; *Hoosier Ins. Co. v. Mangino, supra* at 982; *Joseph Schlitz Brewing Co. v. Central Beverage Co., Inc., supra* 172 Ind.App. at 105, 359 N.E.2d at 581. Obviously, the trier of fact cannot measure the "punishment" or the deterrent effect on others similarly situated without knowledge of the defendant's ability to respond to a particular award entered against the defendant.

Having decided there is sufficient evidence to support the punitive damages verdict, we find no error in the trial court's admission of an exhibit showing Riverside's net worth.

Finally, Riverside asserts it was prejudiced by counsel's remarks in final argument that if in fact the Pedigos set fire to their house, they should be tried, convicted, jailed and removed from their children. Riverside objected to the remarks on the ground they were "highly improper." The trial court sustained the objection. The question whether conduct of counsel was so improper as to prejudice the fair conduct of

the trial is within the sound discretion of the trial court. *Dale v. Trent* (1970) 146 Ind.App. 412, 256 N.E.2d 402. Unlike trial judges, we do not have the advantage of observing the events at trial and their effect on the jurors. Consequently, the decision of the trial court on matters of alleged misconduct of counsel will not be disturbed on appeal unless it appears the trial court has abused its discretion and the appellant has been harmed thereby. *Dale v. Trent, supra.* Riverside had not shown how it was prejudiced when the trial court sustained Riverside's objection. Furthermore, we fail to see how the trial court abused its discretion when Riverside sought no other relief from the alleged misconduct other than an objection which the trial court granted. The trial court's disposition of the alleged improper remarks by counsel was not error.

Affirmed.

SHIELDS, J. (sitting by designation) concurs.

YOUNG, J., concurs in result.