THOMPSON, B/N/F, THOMPSON *v.* OWEN.

[No. 20,215. Filed July 22, 1966. Rehearing denied August 22, 1966. Transfer denied June 12, 1967.]

*Jordan D. Lewis* and *Lewis & Lewis,* of counsel, both of Terre Haute, for appellant.

*Dix, Dix, Patrick, Ratcliffe & Adamson,* of Terre Haute, for appellee.

BIERLY, J.—This action was brought by appellant, by his next friend, against appellee, seeking damages for personal injuries allegedly sustained by reason of the negligence of the appellee. In material substance, appellant's Third Amended Complaint, hereafter called complaint, charged that on May 15, 1960, appellant sustained injuries by a rotary power lawn mower, owned by appellee, when being used by Becky Owen, his daughter, struck appellant's foot. The complaint alleged four grounds of negligence.

The issues, appropriately formed and closed, were submitted to trial before a jury in the Clay Circuit Court after a change of venue had been perfected from the Superior Court of Vigo County No. Two. At the conclusion of the evidence by appellant, the appellee moved the court instruct the jury to return the verdict in his favor. The Court entered its ruling in these words:

> "Said motion is sustained and the jury is returned into open court. The court instructs the jury to return a verdict for the defendant which instruction is furthur identified as Instruction No. 1. . . . and pursuant to said direction of the court the jury returns the following directed verdict, to-wit:
>
> "We, the jury, find for the defendant."

The court thereupon rendered judgment on the verdict that appellant take nothing, and by his complaint that appellee recover his costs against appellant. Appellant's motion for a new trial was overruled, and thence this appeal arose.

It is the contention of the appellant that is was error for the verdict to be directed against him. Appellant further insists that evidence was produced and in the record from which the jury might reasonably draw inferences on every material allegation contained in appellant's complaint, including one or more of the specific charges of negligence, thereby entitling appellant to have the issues submitted to the jury for action.

Appellant assigns as error the overruling of his motion for a new trial.

The motion for a new trial contains three specifications, to-wit:

"1. The verdict of the jury is contrary to law.
"2. Error of law occurring at the trial, as follows: the Court erred in sustaining defendant's motion for a directed verdict, made at the close of plaintiff's evidence.
"3. Error of law occurring at the trial, as follows: The court erred in giving to the jury a peremptory in-

struction directing the jury to return a verdict for the defendant."

Appellant combined in his argument Cause No. 1, of the Assignment of Errors, and Causes No. Two and Three of the Motion for a New Trial.

According to Rule 1-7, of the Rules of the Supreme Court of Indiana:

> "The court's action in directing or refusing to direct a verdict shall be shown by order book entry. Error may be predicated upon such ruling or upon the giving or refusing to give a written instruction directing the verdict."

In accordance with the stated provisions of said rule, it appears that specifications (2) and (3) of the motion for a new trial by appellant, make it imperative for us to consider the claims of the appellant, the evidence and permissible inferences tending to sustain it, and thence determine the soundness of the court's direction to the jury to find for the appellee.

It would appear unnecessary to point out the conditions and underlying principles and circumstances under which a trial court may properly direct a jury to find for the defendant, and return a verdict thereon. In the case of *Whitaker, Admr.* v. *Borntrager* (1954), 233 Ind. 678, 122 N. E. 2d 734, the Supreme Court pointed out and re-stated, in the exact manner, fortified with numerous citations of authorities in support thereof, the fundamental and long established rules and principles as guide lines to trial courts in making a judgment on a motion for a directed verdict.

We recognize that the courts of this state have a duty and responsibility to safeguard the citizens from actions devoid of foundation in law, yet we are not unmindful of this quotation from the case of *Garr* v. *Blissmer et al.* (1962), 132 Ind. App. 635, 648, 177 N. E. 2d, 913, to-wit:

> "The constitutional provision of the State of Indiana, as stated in Article 1, Section 20, to-wit:

'In all civil cases, the right of trial by Jury shall remain inviolate.'

lays a heavy restraining hand upon the Courts to deny the submission of a cause brought in good faith and based upon a situation involving far reaching and serious consequences to the plaintiff."

In *Estes* v. *Anderson Oil Co.* (1931), 93 Ind. App. 365, 370, 176 N. E. 560, the court said:

"The law very zealously protects one against whom a motion for a directed verdict is addressed."

We hold that the primary question sought to be presented for judgment in this appeal is whether there was some substantial evidence upon which the jury might have returned a verdict for appellant.

Appellant approvingly quotes from the case *Huttinger* v. *G. C. Murphy Company* (1961), 131 Ind. App. 642, 645, 172 N. E. 2d 74, as follows:

"In determining when a court may properly grant and give a peremptory instruction to find for defendant, cognizance of the 'compelling laws,' as set out in *Whitaker, Administrator, etc.* v. *Borntrager* (1954), 233 Ind. 678, 680, 681, 122 N. E. 2d 734, must be taken. These are:

1. 'When there is a total absence of evidence or legitimate inference in favor of the plaintiff upon an essential issue; or where the evidence is without conflict and is susceptible of but one inference and that inference is in favor of the defendant. (Citations Omitted.)

2. '. . . The court will not weigh the conflicting evidence or inferences but will consider only the evidence and inferences that are most favorable to the party against whom the motion for a peremptory verdict is directed. (Citations Omitted).

3. 'In determining whether a peremptory instruction should be given the court must accept as true all facts which the evidence tends to prove and draw, against the party requesting such instruction, all inferences which the jury might reasonably draw.' " (Citations of cases omitted).

We deem it to be well settled that a trial court may, and it is its duty, upon request properly made to direct a verdict for a defendant in cases where the evidence presented most favorable to plaintiff, together with all reasonable inferences which a jury might draw therefrom, is not sufficient to establish one or more facts essential to the plaintiff's right of action. *Patterson* v. *Southern R. Co.* (1913) 52 Ind. App. 618, 99 N. E. 491; *Slinkard* v. *Babb, Wilson* (1954) 125 Ind. App. 76, 80, 112 N. E. 2d 876:

> "The foregoing rule *only* applies where it clearly appears that the evidence fails to establish one or more of the facts essential to a recovery, *and where the facts and the reasonable inferences which may be drawn therefrom are not disputed* and where the only possible inference to be drawn therefrom is favorable to the party asking the instruction." (Our Emphasis). *Slinkard, supra.*

The principal question for our determination in passing upon appellant's assignment of errors, and points two and three raised under his motion for a new trial, is whether there was sufficient evidence as a matter of law to go to the jury on the question of negligence of appellee.

The cause was tried upon four allegations of negligence contained in plaintiff's Third Amended Complaint followed by defendant's denial. These allegations follow:

> "(a) Defendant negligently and carelessly allowed his defective power lawnmower to be used by other persons, including this plaintiff, when said defendant knew, or in the exercise of reasonable care should have known, that said lawnmower was defective and inherently dangerous to users, including the plaintiff.
>
> "(b) Defendant negligently and carelessly failed to warn users including plaintiff of the defective condition of his power lawnmower as aforesaid.
>
> "(c) Defendant negligently and carelessly failed to repair his said defective power lawnmower before permitting other persons, including plaintiff, to use his said lawnmower when he knew it was defective as aforesaid.
>
> "(d) Defendant negligently and carelessly failed to inspect his said rotary power lawnmower before permitting

others including plaintiff to use said mower when he knew it was defective as aforesaid."

According to the record evidence, plaintiff went to the home of defendant in the morning of May 15, 1960, and then, soon after he accompanied Becky Owen, daughter of the defendant, to the Jenning's home, two (2) doors south, where Becky was intending to mow grass. Becky asked the plaintiff to start the mower which he did.

Upon approaching a flower bed with the mower Becky was unable to turn it aside, and being unable to back it up, she got off the mower, whereupon appellant pushed it back after he was unable to throw the gear shift lever into reverse. Thence, Becky again continued with the mowing. A second time Becky moved up to a flower bed, and being unable to turn the mower aside, she threw the gears into neutral and again got off the mower. As plaintiff attempted to push the mower back, the shift lever apparently jerked from its neutral position to the forward gear, and before plaintiff had disengaged the gears, the mower ran onto his foot causing severe injury to it.

Plaintiff on direct examination gave testimony in part as follows:

"Q. When you saw the lawn mower over there, was anybody ever riding it?

"A. Yes.

"Q. At any time was Mr. Owen ever present?

"A. Yes, sir.

"Q. When?

"A. A number of times.

"Q. Did you ever hear Mr. Owen discuss this lawnmower or have a discussion with you concerning this lawn mower before May 15, 1960?

"A. At one time somebody was riding the lawn mower and they tried to back up and they had to rare back on it real hard to get it to go after they put it in reverse and I asked him why the lawn mower wasn't —didn't work right and he said that it needed a belt replaced."

"Q. Needed a belt replaced?
"A. Yes."

In addition, testimony given by plaintiff on direct examination in part is as follows:

"Q. What was the lawn mower doing down there?
"A. I don't know. She was going to mow the grass.
"Q. When you got down there, what did you and she do?
"A. She asked me to start it for her.
"Q. Did you?
"A. Yes."

The foregoing recital of part of plaintiff's testimony was stressed in support of his contention that the case at bar should have been submitted to the jury for consideration.

On cross-examination the testimony of plaintiff in part, we set forth as follows:

"Q. Now let's get back to the day in question, well before that, I believe you said that occasionally before this occurred you would baby sit, that is come to the Owen's house on Saturday night or possibly on Sunday night if they were going some place and stay with their children?
"A. Yes, sir.
"Q. That's the smaller children?
"A. Yes, sir.
"Q. Now on this particular Sunday, May 15, 1960, you hadn't been asked over to baby sit with the children, had you?
"A. No, sir.
". . . .
"Q. And on this particular Sunday morning you had just sort of drifted over there to visit with them a little bit?
"A. Yes.
"Q. You weren't baby sitting or working for them in any way?
"A. No.
"Q. When you got there, Mr. Owen wasn't there, was he?
"A. No, sir.

"Q. You don't know where he was?

"A. No.

"Q. Or how long he had been gone?

"A. No.

"Q. He had no way of knowing you were coming over that day, did he?

"A. Not that I know of.

"Q. And he didn't come home any time while you were there, did he?

"A. No.

"Q. And when you got there as I understand it, the mower was already over at the Jennings house?

"A. Yes, sir.

" . . . .

"Q. And you went over and started it for her? [Becky]

"A. Yes, sir.

"Q. Now was Mr. Jennings there?

"A. He came out later.

"Q. Before the accident occurred?

"A. Yes, sir.

"Q. It was his lawn that Becky was mowing?

"A. Yes, sir.

" . . . .

"Q. Before you started over there to the Jennings yard to help Becky or to start this motor or whatever it was, when you started over there, didn't Mrs. Owen tell you that she'd just as soon you didn't do it.

"A. Yes, sir.

"Q. But you went ahead any way?

"A. Yes, she told me I didn't have to if I didn't want to.
" . . .

"Q. Now, going back to this situation as it occurred there, she had gotten stopped once and had gotten off the mower and I think you said it was in neutral, now what did you do that time? I'm not talking about the time you got hurt, but the first time?

"A. The first time I put it in reverse to see if it'd back itself up and it wouldn't back up so I went ahead and pushed it on back.

"Q. What did you do, put it in neutral and then push it?

"A. I just pushed on the lever and pushed on the handle bars of it. I believe it was on the handle bars and I just held it in gear and pushed it back.

"Q. You held it in a reverse position and pushed it back?

"A. Yes, sir.

"Q. Now, the second time, the time where you actually got hurt, what did you do that time?

"A. She got off of the mower as before and apparently it was in neutral. As I started to push it back I noticed the lever jerked.

"Q. When you say push it back, what do you mean, push what back?

"A. I started to push the mower back.

"Q. Did you at that time push backward on the lever at the same time that you pushed on the handle bar?

"A. No, sir.

"Q. Did you do anything with the lever at that time?

"A. No, sir.

"Q. What did you say happened?

"A. I noticed the lever jerked and started forward by the time I got it out of gear it had run over my foot.

"Q. Now were you familiar with the operation of this particular lawn mower before you went over there and started doing this that day?

"A. I knew how it worked, yes.

"Q. You knew how it worked, in all particulars, I mean position of forward and reverse lever?

"A. Yes, sir.

"Q. And how it started and everything else?

"A. Yes, sir.

"Q. You were at that time almost eighteen, weren't you?

"A. Yes, sir.

"Q. Now, do you know enough about the mechanics of the lawn mower to know how the power of the motor was transmitted by belt or by gear or what?

"A. I presume by belt beacuse Keith Owen had told me that it needed a reverse belt; or it needed a belt.

"Q. In connection with the reverse you mean?

"A. The reason that it wouldn't work, yes.

"Q. In reverse?

"A. That's right.

We are of the opinion that the record fails to disclose that appellee, on the day in question, knew that appellant was going to assist his daughter in starting the mower. At no time had appellee given appellant permission to use and operate the mower.

It is true that at one time, appellee had told appellant that the mower needed a new belt to operate it in reverse as the old belt was defective. This evidence of a defective belt should have been a warning to appellant to exercise caution were he to attempt to use the lawn mower in any manner.

We fail to see any connection between the reverse defective belt, and the "jerk" of the shift lever from a neutral to a forward gear. Further, there was no evidence that the difficulty encountered by Becky in backing the mower on May 15, 1960, was caused by the defective belt of which the appellee had informed appellant.

We likewise have the testimony of Mrs. Owen, wife of the appellee, that she had advised appellant to not start the mower or use it. This advice was ignored by appellant. The record is silent as to just why this advice was given and rejected. It appears that the court could reasonably infer: that since appellant was warned or advised to not start the motor or use the mower; that since the appellant pushed the mower back successfully the first time; and, that since appellant had latent knowledge of the defective reverse belt; that appellee in no way could be lawfully held to have been negligent in law for the injury suffered by the appellant.

We, further, are of the opinion that the appellant, a lad of about eighteen (18) years, was a volunteer or in law a licensee. By attempting to impugn actionable negligence to appellee in a situation or circumstance such as this, did require an extension of liability not contemplated by statute or case law.

We note the three essential elements in actionable negligence as enumerated in *Faris* v. *Hoberg et al.* (1892), 134 Ind. 269, 33 N. E. 1028. These are as follows:

"1. The existence of a duty on the part of the defendant to protect the plaintiff from the injury of which he complains;

"2. A failure by the defendant to perform that duty; and,

"3. An injury to the plaintiff from such failure of the defendant.

"When these elements are brought together, they unitedly constitute actionable negligence. The absence of any one of these elements renders a complaint bad or the evidence insufficient." Also, see: *Garr* v. *Blissmer et al.* (1962), 132 Ind. App. 635, 177 N. E. 2d 913.

We think the rule is well established by case law in this state that, unless proof of wilful injury, a volunteer cannot recover. *Standard Oil Co. of Ind., Inc.* v. *Scoville* (1961), 132 Ind. App. 521, 175 N. E. 2d 711; *Robertson* v. *Commercial Telephone Co.* (1933), 96 Ind. App. 47, 180 N. E. 492. *Cooper, by Next Friend,* v. *The Lake Erie and Western R. R. Co.* (1893), 136 Ind. 366, 36 N. E. 272.

Thus, in considering the evidence in the case at bar, if any duty be owed to appellee by appellant it would consist in avoiding a lawful injury to appellant. It appears, and we conclude that in the case at bar, no evidence is forthcoming that appellee caused either directly or indirectly a lawful injury to the person of the appellant. Thus, we think that the court owed a duty to direct a verdict in favor of appellee. See: *Garr* v. *Blissmer et al., supra.*

This case resolves itself into a situation where appellant voluntarily responded to the request of Becky Owen to start the motor, and later pushed back the mower when Becky was unable to turn it aside on approaching the garden bed.

The court could have inferred, and no doubt did infer, from the foregoing evidence, and in considering the fact that a

rotary lawn mower may be potentially dangerous, that the appellant wholly failed to prove the allegations of the complaint as to negligence on the part of the appellee, and hence a finding for a directed verdict in favor of appellee was timely made.

We are of the opinion that the court committed no reversible error in law in directing a verdict in favor of appellee, and entering a judgment on the verdict as rendered.

Judgment affirmed.

Smith, C. J. dissents.

Hunter, J. concurs in result only.

Mote, J. concurs.

### ON PETITION FOR REHEARING

BIERLY, J.—The first sentence of the first paragraph on Page 12, of the original opinion reading as follows:

"We likewise have the testimony of Mrs. Owen, wife of the appellee, that she had advised appellant to not start the mower or use it,"

was intended and is hereby stated to read as follows:

"We likewise have the testimony of appellant that Mrs. Owen, wife of the appellee had advised appellant to not start the mower or use it."

Further, the first two sentences in the paragraph in the middle of page 13 of the original opinion reading as follows:

"Thus, in considering the evidence in the case at bar, if any duty be owed to appellee by appellant it would consist in avoiding a lawful injury to appellant. It appears, and we conclude that in the case at bar, no evidence is forthcoming that appellee caused either directly or indirectly a lawful injury to the person of the appellant."

was intended and is hereby stated to read as follows:

"Thus, in considering the evidence in the case at bar, if any duty be owed by appellee to appellant it would consist in avoiding an unlawful injury to appellant. It appears, and we conclude that in the case at bar, no evidence is forthcoming that appellee caused either directly or indirectly an unlawful injury to the person of the appellant."

Subject to the corrections heretofore set out, the appellant's Petition for Rehearing is hereby denied.

NOTE.—Reported in 218 N. E. 2d 351.