JONES ET AL. *v.* HERNANDEZ.

[No. 1069A170. Filed November 19, 1970. Rehearing denied December 16, 1970. Transfer denied March 25, 1971.]

*Vincent Kelley, Kelley & Arnold,* of Anderson, for appellants.

*Alan H. Lobley, G. Daniel Kelley, Jr., Ice Miller Donadio & Ryan,* of Indianapolis, Davisson, Davisson & Davisson, of Anderson, for appellee.

SHARP, J.—The Plaintiff-Appellee, Sixto Hernandez, filed his complaint for personal injury damages against both Defendants-Appellants, James N. Jones and Mary Jones. The essential allegations of said complaint are:

"That on the 5th day of September, 1968, appellee was working as a migrant worker on a farm adjacent to appellants' farm and that appellants caused a fence line between said farms to be connected to an electrical outlet on said premises carrying approximately 110 volts of electricity. That appellants knew that migrant workers were living and working in close proximity to said fence, and that on the date alleged, appellee came in contact with said fence while standing on land of his employer, that the ground was damp and the electrical charge caused the muscles of his fingers to contract and he was unable to release said fence for a period of ten minutes and was thereby seriously burned in each hand, incurred hospital and medical expenses, severe pain, and suffering, and that he lost much income from the loss of work.

That negligence of appellants was as follows:

a. improper installation of a fence wire designed to carry electricity.

b. connecting a fence wire with a 110 volt outlet.

c. by failing to follow prescribed standards for use of an electrical fence wire on farm land.

d. by failing to warn all persons in the area of the highly dangerous condition which they had created.

e. by failing to inspect and repair the fence line and by allowing the same to exist in such a state of disrepair as to make safe use of an electrical wire in conjunction with same impossible."

Appellee's complaint also charged that appellants knew that 110 volts of electricity would cause personal injuries or death to any person coming into contact with the same and that they wilfully, wantonly, recklessly and without regard for the consequences, charged said fence wire by

connecting the same to a 110 volt outlet when they knew persons were in the vicinity of said fence.

Appellants filed answer in general denial and the case was submitted to a jury which rendered a verdict for the Appellee against both Appellants in the sum of $7500.00 compensatory damages and $500.00 punitive damages. Appellants' Motion for New Trial was overruled, which is the sole assignment of error here.

The Appellants "summary" of the evidence covers 80 pages of their Brief. We will attempt to briefly set forth the salient and necessary facts. No question is argued here in regard to the admission of any evidence and no challenge was made in the trial court as to the sufficiency of Appellee's complaint.

The Appellants made numerous assertions of error in their Motion for New Trial and in their Briefs as originally filed in this case. However, during oral argument the Appellants' counsel explicitly waived for all purposes all issues except that the verdict is not sustained by sufficient evidence, that the verdict is contrary to law and that punitive damages are excessive as to both Appellants. Appellants expressly waived any argument as to the excessiveness of the compensatory damages.

In order to consider the issues which are presented for our consideration we must examine the evidence most favorable to the Appellee.

The Appellee was a farm laborer who resided in Texas and was working during the summer of 1968 as a farm laborer in the vicinity of Anderson, Indiana. Appellee and other farm laborers lived in a labor camp on property adjacent to the Appellants' property. There was a history of antagonism by both Appellants toward the farm laborers who lived at the camp in question. On September 5, 1968, the Appellee was helping to load tomatoes on a truck in a field immediately adjacent to the Appellants' property. The

truck which the Appellee was loading floundered in soft dirt spilling about a half a load. Part of the spilled tomatoes fell in the vicinity of the electric fence which the Appellants had installed on or very near the property line which divided Appellants' property from that upon which the Appellee was working. The Appellee was retrieving those tomatoes when he came in contact with the electric fence in question. At that point the Appellee Hernandez touched a wire which was a part of a fence complex at that location. His hands became immediately engrafted upon the wire and he yelled, "Please help me, come quickly, get this away from me I think I am dying, it's killing me." He could not get free. It seemed like the wire was drawing him to it. A co-worker attempted to release him and likewise became fastened to the same electrical wire. After some minutes another co-worker handed a box to one of the two persons fastened to the electric wire and in about ten minutes the Appellee was able to detach himself from the electric wire. The ground was humid and moist and the Appellee's hands were cut and blood was coming from them. The Appellee screamed, "Oh, my God, my God I'm dying." and "Oh, My God, my God I'm dead."

The Appellee was immediately taken to the doctor who found that Appellee's hands were massively burned and cut and he was unable to work for a period of 40 to 60 days. The fence line in question was several years old and was actually two or three fences all woven together and "intermingled among the dirt, weeds, grass and trees." The incident in question occurred at approximately 5:00 o'clock P.M. The owner of the adjacent farm arrived on his farm at approximately 5:30 to 6:00 o'clock P.M. after the above incident. A State Trooper attempted to investigate the incident at approximately 9:30 o'clock P.M. on the same day. The Trooper inspected the point where the electrical fence was hooked up, which was behind a small shed in the homestead area immediately back of the Appellants' residence. The wire in question led from the milkshed and was attached to the

fence. There was a light bulb on the outside of the shed in an apparatus, exhibited to the jury by photograph, from which the wires going to the fence and to the 110 volt outlet were attached. There was evidence that said fence was directly connected to the 110 volt outlet. At one point Appellant James Jones denied to the Trooper that there was a direct connection between fence and 110 volt outlet because the current went through a 15 watt bulb.

There was expert testimony that sending the current through a 15 watt bulb would not significantly affect the dangerous propensity of such a mechanism. There was also expert testimony that under certain conditions 110 volts is sufficient to kill or seriously injure a human being if there is a good ground connection.

There is also evidence to dispute Appellant James Jones' contention that said fence was, in fact, run through a 15 watt bulb at all from the 110 volt outlet. Neighboring farmers testified they had never known anyone to hook an electric fence to a 110 volt outlet. An expert electrician testified that running 110 volts through a 15 watt bulb "would be practically nil" to reduce the voltage. He also described 110 volts as "very lethal". When asked his expert opinion as to 110 volts directly connected if a person came into contact with it, being grounded well, he suggested "You notify the next of kin."

The Appellants were owners of the real estate in question as tenants by the entireties. The shed where the fence was hooked up to the 110 volt outlet was immediately outside Appellants' residence. Appellant James Jones testified, in part:

"Q. Your wife has another job but she devotes quite a bit of time to the farm, I assume?

"A. That's right.

"Q. You and your wife joined in the farming operation, did you?

"A. Yes.

"Q. Was she aware that you had an electric fence?

"A. Yes, I guess she did.

          *   *   *

"Q. Was she aware that you had this one?

"A. I suppose.

          *   *   *

"Q. Did you ever have any conversation with your wife about that electric fence?

"A. Not out of the ordinary, no. We had used electric fence before, so I don't see why there would be any need for any extra conversations.

"Q. Did she ever go into this shed you are talking about—the milk shed?

"A. Yes, she goes in it a lot."

Appellant Mary Jones knew of the electrical fence and went into the milk shed "a lot". Her testimony demonstrated considerable general knowledge of the activities on Appellants' farm. She professed to know that there were cows in the field in question on September 5, 1968. She said she had discussed with her husband that cattle had gotten out of the field in question in 1967. She had discussions with her husband and Mr. Ashton, owner of the adjacent property about the problems with the fence in question. She knew how electric fences were operated. She was also co-owner of the cattle on Appellants' farm.

Appellants claim the fence in question was erected in 1968 to contain cattle. However, there is evidence that there were no cattle in the Appellants' field any time in 1968, that the weeds there were high and untrodden and that Appellants' same field was unfenced on two sides so that it could not contain any cattle. The electric fence was constructed at about the same time as the labor camp on the Ashton property.

There is evidence of considerable animosity between Appellants and Ashtons regarding the labor camp. Mr. Ashton testified that he and his family underwent a great deal of

harassment over it from the Joneses. Appellant Mary Jones called the Director of Madison County Planning Commission to object to the construction of the farm labor camp. She also called attorneys for the Plaintiff in this, objecting to the construction of the farm labor camp.

The Appellants argue that the joint enterprise of the Appellants is not directly alleged in Appellee's complaint. However, the Appellee asserts there is no fatal variance between the pleadings and proof and the pleadings are deemed to be amended to conform to the proof as indicated in *General Outdoor Adv. Co.* v. *La Salle Realty Corp.,* 141 Ind. App. 247, 218 N. E. 2d 141 (1967). We agree and have recently reaffirmed this position in *Harrold* v. *Markin,* 145 Ind. App. 619, 252 N. E. 2d 159 (1969). Our Supreme Court apparently agrees also. See *Morrison's Southern Plaza Corp* v. *Southern Plaza,* 252 Ind. 109, 246 N. E. 2d 191 (1969).

There is also evidence from which the jury could infer that Appellants were involved in a joint enterprise as to the farming operations. This evidence goes much further than mere co-ownership. *Keck* v. *Pozorski,* 135 Ind. App. 192, 191 N. E. 2d 325 (1963), sets forth the requirements of such a joint enterprise as follows:

"1. A community of interest in the object and purpose of the undertaking.
2. An equal right to direct and govern the conduct of the other in respect thereto, and
3. A contract, either expressed or implied, to that effect.

These rules were more recently reaffirmed in *Pierce* v. *Hovarth,* 142 Ind. App. 278, 233 N. E. 2d 811 (1968).

The facts here disclose a community of interest, the equal right to direct which is insufficient to infer an agreement to that effect. It is also clear that the electrification of the fence was done in the course and scope of the operation of the farm.

In reality the main thrust of the excessive damage argument is directed to the $500.00 award for punitive damages as to Appellant Mary Jones.

In Indiana punitive damages are proper where the acts of the wrongdoer are such as to indicate heedless disregard of the consequences. *Harness* v. *Steele,* 159 Ind. 286, 64 N. E. 875 (1902) and Citizens Street R. R. Co. of *Indianapolis* v. *Willoeby,* 134 Ind. 563, 33 N. E. 627 (1893).

There is sufficient evidence for a jury question on this issue of punitive damages. Connecting a farm electric fence to 110 volt outlet under the circumstances here may manifest a heedless disregard for the probable consequences to a person coming into contact with the fence. There were serious questions of credibility as to the testimony of both Appellants for the jury to resolve. Both Appellants knew that laborers were working in close proximity to the fence. In view of all the circumstances the jury could have determined that said fence was electrified 110 volts to keep the farm laborers off their property. The animosity of the Appellants toward the laborers was clear.

The actual knowledge of the Appellant, Mary Jones, could have been inferred from all the circumstances as Judge Hoffman stated in *National City Lines* v. *Hurst,* 145 Ind. App. 278, 250 N. E. 2d 507, 510 (1969):

> "The fact is that 'actual' knowledge, like 'premeditation' in criminal actions, is very seldom admitted by a defendant . . . and thus the question is quite often left to the subjective determination of the jury, to be imputed by a preponderance of the evidence. Thus, the question is not whether the defendant confessed 'actual' knowledge, but instead, whether there was sufficient evidence to justify the jury in finding by a subjective imputation that the defendant had 'actual' knowledge."

Whatever may have been the status of Appellee, the Appellants cannot justify the construction of an apparatus

which would be capable of doing serious bodily harm even to a mere trespasser. See *Sisk* v. *Crump*, 112 Ind. 504, 14 N. E. 381 (1887). See also cases collected 44 A. L. R. 2d 383 and Restatement of Torts 2d, § 85.

The jury could have determined that Appellee was not on the premises of the Appellants at the time of his injury. Therefore, it is not necessary to reach the rule as to licensee as stated in *Thompson* v. *Owen*, 141 Ind. App. 190, 218 N. E. 2d 351 (1966).

The evidence is not without conflict and does not lead solely to one conclusion contrary to the verdict within the rules stated in *NIPSCO* v. *Otis*, 145 Ind. App. 159, 250 N. E. 2d 378 (1969) and *Coleman* v. *DeMoss*, 144 Ind. App. 408, 246 N. E. 2d 483 (1969).

Therefore, the Appellants have shown no basis for reversal of this case. It must be and hereby is affirmed.

Hoffman, P.J., and White, J., concur.

Pfaff, J., not participating.

NOTE.—Reported in 263 N. E. 2d 759.