ORKIN EXTERMINATING COMPANY, INC., Appellant (Defendant Below),

v.

Charles TRAINA and Michelle Traina, Appellees (Plaintiffs Below).

No. 4–782A193.

Court of Appeals of Indiana, Fourth District.

March 26, 1984.

Rehearing Denied May 16, 1984.

John P. Price, Jon D. Krahulik, Robin L. Babbitt, Bingham Summers Welsh & Spilman, Indianapolis, John D. Proffitt, Campbell Kyle & Proffitt, Noblesville, for appellant.

· Robert W. York, Albert George, Buth, George, York & Kuster, Indianapolis, Michael A. Howard, Smith Pearce & Howard, Noblesville, for appellees.

CONOVER, Presiding Judge.

Orkin Exterminating Co., Inc. (Orkin) appeals a judgment rendered against it upon a jury verdict in favor of Charles Traina (Charles) and Michelle Traina (Michelle) awarding them $400,000 in punitive damages. It does not take issue with a $65,000 award to Charles for compensatory damages, or a $2,500 award to Michelle for loss of consortium.

We affirm.

ISSUES

This appeal presents the following issues:

1. Whether an employer's failure to discharge or closely supervise an employee it discovers carrying an illegal firearm on company property constitutes wilful and wanton misconduct when such employee's subsequent negligence involving the firearm results in serious injury to one of the employer's customers.

2. Whether the trial court erred in giving a punitive damages instruction which advised the jury,

 a. punitive damages could be awarded for mere wantonness,

 b. punitive damages were appropriate if an employee were "unfit" and the employer "reckless" in employing or retain-

ing him, and contained statements which were internally inconsistent.

## FACTS

Charles and Michelle, newlyweds, purchased a home in northern Indianapolis in June of 1979. Shortly after moving, they discovered a number of flying ants. Because of Orkin's billboard and television advertising, Charles contacted Orkin's Indianapolis office. After a visit by an Orkin representative, Charles signed a one year service contract.

On September 22, 1979, one of Orkin's pest control technicians, Jesse James Coleman (Coleman), came to the Traina home to apply pest spray in the basement. As Coleman bent over to do his work, a tear gas gun (pen gun) Coleman had modified to fire a .25 caliber bullet, fell from his shirt pocket and discharged when it hit the concrete floor. The bullet struck Charles in the right forearm, severely injuring him. He was standing in a basement doorway watching Coleman work when the weapon discharged.

Orkin, the world's largest termite and pest control company, has more than 330 offices in the United States and Canada. Its pest control technicians enter the homes of Orkin's customers and perform their work without supervision, sometimes when the owners are absent. Orkin has developed extensive written policy statements describing the procedures to be followed by its supervisory personnel when hiring and training new employees. It hired Coleman as a pest control technician on August 27, 1979.

As to Coleman, Orkin's Indianapolis management personnel failed to follow Orkin's hiring and training procedures by failing to

(a) adequately train management trainee Hinkley, who hired Coleman, in its hiring procedures,

(b) check Coleman's work history and reputation with the required five of his former employers rather than with the only one it did, the Indiana University, Purdue University at Indianapolis (I.U.P.U.I.) security department,

(c) interrogate him regarding the "gaps" in his prior employment history revealed by his employment application, and

(d) train him for his position as a pest control technician in the required manner and for the required length of time.

However, an exhaustive background check only would have revealed an unremarkable employment history in Coleman's case, that is, no facts which would have put Orkin on notice a catastrophic event such as is here involved was likely to occur as a result of Orkin's proposed employment of Coleman.[1]

In September, 1979, two days before Charles was shot, Hinkley discovered Coleman at the office working on his pen gun. Coleman had both read and understood Orkin's company policy prohibiting the carrying of firearms either on its property or in a customer's home. He told Hinkley he carried the pen gun to protect himself from "big loose dogs", one of which had chased him to the top of his truck. He had, however, reduced the shell's powder charge so as not to kill any dogs. Orkin did not give its pest control technicians dog protection

---

**1.** On the contrary, such an investigation would have revealed Coleman successfully worked as a security guard for a detective agency, in addition to his work as a security guard for I.U.P.U.I. Presumably, he carried firearms when working for those two employers without having firearms-related problems.

Further, I.U.P.U.I.'s Captain Rogers advised Orkin's caller Coleman had a reputation for honesty and integrity, and was an average employee. He was unaware of Coleman's ever working under the influence of alcohol or drugs, of committing a crime, an act of violence, or being involved with the police. Rogers

further was of the opinion I.U.P.U.I. should not hire Coleman and put him in private homes because

"[w]e have housekeeping people that can do that. They really shouldn't be in police work."

(R. 1,232).

The evidence clearly reveals Coleman was not a shadow image of his desperado namesake (Jesse James) as the Trainas' brief would have us believe. The evidence, on balance, reveals quite the contrary to be true. Their brief, in this regard, is overreaching.

training. Coleman had discussed his dog problem with Hinkley on two previous occasions.

Hinkley strongly told Coleman not to carry the weapon, it was against company policy. He told Coleman to stand still with palms outstretched toward any threatening dog and greet him so he wouldn't bite, substantially the same advice he had given Coleman previously. Coleman agreed not to carry the weapon, saying he understood the reasons why he should not.

Upon that understanding, Hinkley dropped the subject. He assumed Coleman would obey him, and made no further effort to check whether Coleman was complying with his order, either by visual observation or by asking Coleman if he was carrying the weapon, and failed to report the matter to his superiors. Coleman returned to his duties, again unsupervised.

Violation of Orkin's firearms policy was grounds for immediate termination. Coleman was terminated two days later after he drove Charles to the hospital.

Orkin's net worth at the end of 1981 was $48,836,000. It appeals only the jury's exemplary damage award of $400,000.

## DISCUSSION AND DECISION

### I.

#### A. The Armstrong Rule

Our supreme court recently decided the case of *Traveler's Indemnity Co. v. Armstrong*, (1982) Ind., 442 N.E.2d 349, a tortious breach of contract case where the jury awarded punitive damages. This case changed the quantum of evidence which must be presented before a jury may return an award of punitive damages in such cases from a "preponderance of the evidence" to a "clear and convincing" standard.

In *Armstrong,* Justice Prentice said:
[P]unitive damages should not be allowable upon evidence that is merely consistent with the hypothesis of malice, fraud, gross negligence or oppressiveness. Rather some evidence should be required that is inconsistent with the hypothesis

that the tortious conduct was the result of a mistake of law or fact, honest error of judgment, over-zealousness, mere negligence or other non-iniquitous human failing.... [A] requirement of proof by clear and convincing evidence furthers the public interest when punitive damages are sought.

*Armstrong,* 442 N.E.2d at 362–363.

#### B. Armstrong Rule Applies to "Pure" Tort Cases

■ *Armstrong* has retrospective as well as prospective application in tortious breach cases. *Don Medow Motors, Inc. v. Grauman,* (1983) Ind.App., 446 N.E.2d 651. It applies retroactively to all cases involving punitive damages whether on appeal or otherwise. *Farm Bureau Mutual Ins. Co. v. Dercach,* (1983) Ind.App., 450 N.E.2d 537. Cases decided since *Armstrong* which reversed and remanded punitive damage awards for re-trial under *Armstrong's* clear and convincing evidence rule are *Lloyd's of London v. Lock,* (1983) Ind. App., 454 N.E.2d 81; *Peoples Trust and Savings Bank v. Humphrey,* (1983) Ind. App., 451 N.E.2d 1104; *Grauman, supra;* and *Tuthill Corp., Fill-Rite Division v. Wolfe,* (1983) Ind.App., 451 N.E.2d 72. The case before us, however, does not present a "tortious breach of contract" case. Breach of the service contract between Orkin and the Trainas was neither alleged nor proved. Only a "pure tort" right-duty relationship independent of that contract was established at trial.

■ Does the *Armstrong* "clear and convincing" evidence rule also apply to pure tort punitive damage cases? We believe it does. In *Armstrong,* Justice Prentice said

The propriety of the clear and convincing evidence standard *is particularly evident in contract cases,* because the breach itself for whatever reason, will almost invariably be regarded by the complaining party as oppressive, if not out right fraudulent.... (Emphasis supplied.)

*Armstrong,* 442 N.E.2d at 363. By implication, Justice Prentice tells us the new *Armstrong* clear and convincing evidence rule applies to all punitive damage cases whether they are tortious breach of contract or pure tort cases. Because of its retrospective application, *Grauman, supra, Armstrong* applies here.

## C. Standard of Review

■ Our standard of review is changed, however, only in that we now review punitive damage cases on appeal with the clear and convincing evidence standard in mind. Otherwise, our standard of review remains the same. In reviewing a jury's award of punitive damages, we will neither weigh the evidence nor determine the credibility of witnesses. Our inquiry is limited to determining whether the verdict is sustained by substantial evidence of probative value. *Riverside Insurance Co. v. Pedigo,* (1982) Ind.App., 430 N.E.2d 796, 803. We consider the evidence and reasonable inferences arising therefrom in the light most favorable to appellees and will reverse only if the evidence leads to but one conclusion and an opposite conclusion was reached below. *Woodard Insurance, Inc. v. White,* (1982) Ind., 437 N.E.2d 59, 67; *Riverside Insurance, Inc., supra,* 430 N.E.2d at 804. To be substantial and of probative value as to a punitive damages award, the evidence must be clear and convincing, that is, there must be some evidence (a) of malice, fraud, gross negligence or oppressive conduct mingled in the breach in tortious breach of contract cases or of malicious, reckless, or wilful and wanton misconduct in pure tort cases, and (b) the tortious conduct is inconsistent with a hypothesis of mere negligence, mistake of law or fact, over-zealousness, or other noniquitous human failing. If a jury determines both these elements are present in the evidence and assessment thereof is in

the public interest, it is warranted in awarding punitive damages. *Armstrong, supra.*

## D. Relationships Existing

Before discussing the sufficiency of the evidence as to punitive damages in this case, we believe an analysis of the relationships existing between Orkin and the various individuals here involved is in order.

### *Orkin-Trainas*

■ Orkin was the provider of services to the Trainas, its customers, under the written contract between them. However, a right-duty relationship existed between them in addition to and independent of the contract. It was merely a condition by which the right-duty relationship arose. Orkin had a duty not to send incompetent or dangerous employees to perform its services in the Trainas' home, the breach of which would render Orkin directly liable to the Trainas rather than through the doctrine of respondeat superior. *Go International, Inc. v. Lewis* (1980, Tex.Civ.App.) 601 S.W.2d 495; *Montgomery Ward and Co. v. Marvin Riggs Co.* (1979, Tex.Civ. App.) 584 S.W.2d 863.

### *Orkin-Coleman/Hinkley*

The Restatement (Second) of Torts, provides:

§ 909. Punitive Damages Against a Principal

Punitive damages can properly be awarded against a master or other principal because of an act by an agent if, but only if,

. . . . .

(b) the agent was unfit and the principal or a managerial agent was reckless in employing or retaining him, .... [2]

---

**2.** Defining Reckless Disregard of Safety, Restatement (Second) of Torts, § 500 reads

The actor's conduct is in reckless disregard of the safety of another if he does an act or intentionally fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a

reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent.

and a special note to that Section says

Here, Hinkley was Orkin's management trainee who had the authority to hire, train, supervise, and discharge Orkin's Indianapolis pest control technicians. If Coleman was unfit and Hinkley was reckless in either "employing or retaining" Coleman, § 909(b)'s requirements are met.

### E. Sufficiency of the Evidence

Given the right-duty relationship existing between these parties, the question becomes whether Hinkley's, thus Orkin's, failure to discharge Coleman or take other action regarding the pen gun and Coleman's fear of large dogs to prevent Charles's injury was "wilful or wanton" misconduct warranting the imposition of punitive damages, or whether such conduct was consistent with a hypothesis of mere negligence, inadvertence, or other noniniquitous human failing.

### Orkin's Duty to Its Customers

It is uncontested Hinkley, the management trainee, was acting within the course and scope of his employment in his dealings with Orkin's employee Coleman. It is further uncontested when Hinkley discovered Coleman with the pen gun, he forcefully ordered him not to carry it. During his deposition, read to the jury, Coleman testified

Q Had Orkin authorized you to carry that pen gun, sir?

A No.

Q Had you discussed the pen gun with anyone at Orkin before the accident?

A Yes, I did.

Q Who had you discussed it with?

A Steve Hinckley, (sic) my Supervisor.

Q When had you discussed it with him?

A A couple days before.

Q How did it happen that you and Mr. Hinckley (sic) discussed that pen gun?

The conduct described in this Section is often called "wanton or wilful misconduct" both in statutes and judicial opinions.

A Well, I had it out there in order to show it to him, but he came and saw me with it and he confronted me about it that day, asked me what it was.

Q Okay. Can you tell the Court and jury what Mr. Hinckley (sic) told you when he saw you holding the pen gun?

A He said I shouldn't have it, there is no way, I'd better get rid of it, cannot take it out on the job nowhere. I would be fired immediately. Anything could happen.

Q You're saying Mr. Hinckley (sic) prohibited you from carrying it?

A Yes, he did.

Q What sort of tone of voice did he use, sir?

A Very strong.

Q What did you say when he prohibited you from carrying the pen gun?

A I agreed with him.

Q You said you would not carry it?

A I said I would not carry it.

Coleman carried the weapon to protect himself from "big loose dogs", a matter of particular concern to Coleman. His testimony continued

Q That time when Mr. Hinckley (sic) prohibited you from carrying the pen gun, do you recall discussing dogs with Mr. Hinckley (sic)?

A Yes, I did.

Q What did you discuss, sir?

A I told him I had a bad problem with big loose dogs and they had run me up on top of my truck and everything. He just told me to stay calm and when I confronted a loose dog and agree to them with my palms out towards the dog and stand still and don't move so they won't bite, just try to greet them. He gave me a couple classes like that.

In the context of this opinion, the word "reckless" appearing in § 909(b) is used as synonymous with the "wilful and wanton" misconduct standard of Indiana law.

Q Are you saying that he tried to tell you how you should handle dogs?

A Yes.

Q At the same time he prohibited you from carrying the pen gun?

A Yes, he did.

This occasion was not the first time Coleman had expressed his concern about dogs to Hinkley, however. Coleman further testified

Q Was that the first time you had discussed dogs with Mr. Hinckley (sic)?

A No, it isn't. There had been *a couple more occasions* where I had talked to him.

Q At those times what had he told you?

A *He told me the same thing.* In fact, he even said that *just ignore them.* He said try to ignore them. That's what he told me the first time, like they're not there. (Emphasis supplied.)

Two elements are beyond question: Hinkley, thus Orkin, had actual knowledge of

(a) Coleman's continuing concern about being attacked by large dogs, and

(b) his concern was so deep-seated he was carrying an illegal weapon, the pen or "zip" gun as it is known in some circles, to protect himself from them.

An employer who negligently hires or retains in his employ an individual who is incompetent, unfit for the job, or dangerous may be liable to a third party whose injury was proximately caused by the employer's negligence long has been the rule in Indiana. It was first adopted in early railroad cases for the protection of such an employee's co-workers, cf. *Evansville & T.H.R. Co. v. Guyton,* (1888) 115 Ind. 450, 17 N.E. 101; *Indiana Union Traction Co. v. Pring,* (1911) 50 Ind.App. 566, 96 N.E. 180.[3] The case before us, however, involves neither negligence nor hiring. It

concerns the wilful and wanton retention of a dangerous employee where punitive as well as compensatory damages were sought and recovered. That Coleman was acting within the scope of his employment is conceded by the parties.

■ Under the right-duty relationship here existing, Orkin could have discharged its duty to the Trainas, as in all tort matters, by the exercise of reasonable care under the circumstances. As Garrard, J., discussing degrees of negligence, cogently has observed

[W]e do not recognize degrees of negligence. There is only one standard: reasonable care under the circumstances. However, to be reasonable, the *quantum of care* exercised *must be proportionate to the danger to be avoided* and the fatal consequences involved in its neglect compared to *the importance of the right the claimant is seeking to advance. Vivian Collieries Co. v. Cahall* (1915), 184 Ind. 473, 110 N.E. 672; *Toledo & Wabash Ry. Co. v. Goddard* (1865), 25 Ind. 185; *Guion v. Terre Haute, I. & E.T. Co.* (1924), 82 Ind.App. 458, 143 N.E. 20. *See, also,* Prosser, *Law of Torts* (4th Ed.), p. 419; and Learned Hand's formulation in *United States v. Carroll Towing Co.* (C.A.2, 1947), 159 F.2d 169. (Emphasis supplied.)

*Phillips v. Croy,* (1977) 173 Ind.App. 401, 363 N.E.2d 1283, 1285. Here the circumstances were Orkin's pest control technicians performed Orkin's services

(a) in its customers' homes,

(b) unsupervised,

(c) occasionally when its customers were not at home.

Orkin's personnel only gained entry to its customers' homes because of Orkin's contractual arrangements with them.

Indiana recognizes the sanctity of the home. The breaking and entry of the building or structure of another with intent

---

**3.** Two recent cases have modified the negligent *hiring* rule, saying where the employer stipulates the employee was acting within the scope of his employment a negligent hiring theory is inappropriate unless punitive damages are

sought. *Shipley v. City of South Bend,* (1978) 175 Ind.App. 464, 372 N.E.2d 490; *Tindall v. Enderle,* (1974) 162 Ind.App. 524, 320 N.E.2d 764.

to commit a felony is a class B felony if the building or structure is a dwelling, but a class C felony if other than a dwelling.[4] Class B felonies carry a fixed term of ten years imprisonment, class C only five.[5]

We recently pointed out the essential difference between first degree burglary and other crimes in this language:

> [W]e feel it is imperative that the essential character of the crime of first degree burglary be kept in mind. Burglary in the first degree is not primarily an offense against property. Rather, it is an offense against the sanctity and security of the home. See generally, *Carrier v. State* (1949), 227 Ind. 726, 89 N.E.2d 74; *Smart v. State* (1963), 244 Ind. 69, 190 N.E.2d 650, Annot., 43 A.L.R.2d 831; 12 C.J.S. Burglary §§ 1b, 16 (1938).

*Bousman v. State*, (1975) 167 Ind.App. 386, 338 N.E.2d 723, see also, *Smart v. State*, (1963) 244 Ind. 69, 190 N.E.2d 650, 652; 43 A.L.R.2d 831, 834–835. Given Indiana's recognition of the sanctity of the home and the close proximity of Orkin's pest control technicians to its customers while performing Orkin's services, a correspondingly high standard of care was imposed upon Orkin because of the inherent danger such facts disclose. As Cox, J., said

> [O]rdinary care ebbs and flows with the danger to be fairly anticipated by a man of reasonable prudence from the circumstances and conditions involved in each case. Where the danger to be anticipated is great, ordinary care may call for the highest vigilance, activity, and unremitting attention to guard against it.

*Louisville & S.I. Traction Co. v. Walker*, (1912) 177 Ind. 38, 97 N.E. 151, 154. Further, Coleman's weapon was not only illegal, it was dangerous. It did not have a safety to prevent its discharge if mishandled. Whether under all the circumstances Orkin's failure to prevent Coleman from carrying this weapon into its customers' homes violated the high standard of care imposed upon it was a jury question:

It may be true, as matter of fact, that the acts of care and precaution which ordinary prudence would suggest, and which would be regarded by a jury as reasonable under circumstances indicating little danger, might be regarded as entirely inadequate under circumstances which would disclose the employment of dangerous agencies involving great danger to life and valuable property; but in all cases and under all circumstances it is for the jury to determine the character and the extent of the danger involved and the amount of care and caution which reasonable care requires in guarding against such danger. The quantum or amount of care required to measure up to "reasonable care" under the circumstances of each particular case is a matter peculiarly within the province of the jury. The quantum of care, the safeguards to be used, the precautions to be observed, the care and foresight to be exercised in each case, must be as variable as the facts involved in different cases are various. It is not practicable for a court to fix and declare as a matter of law the quantum of care or the degree of care that should be exercised under the conditions and circumstances peculiar to any special case; that duty rests with the jury, to be performed under proper instructions from the court.

*Union Traction Co. of Ind. v. Berry*, (1919) 188 Ind. 514, 121 N.E. 655, 658.

### Proximate Cause

Orkin argues the punitive damage award was improper because the evidence did not establish a proximate relationship between Hinkley's tortious conduct and the Trainas' injuries. Proximate cause is that cause which, in natural and continuous sequence, unbroken by any efficient intervening cause, produces the result complained of and without which the result would not have occurred; foreseeability of injury is the essential element or fundamental test of proximate cause. *Havert v. Caldwell*,

---

4. See IND.CODE § 35–43–2–1.

5. IND.CODE § 35–50–2–5, and IC § 35–50–2–6.

(1983) Ind., 452 N.E.2d 154, 155, 158; *Condor v. Hull Lift Truck, Inc.*, (1982) Ind., 435 N.E.2d 10, 14; *Johnson v. Bender*, (1977) 174 Ind.App. 638, 369 N.E.2d 936, 939; *New York Central R.R. Co. v. Cavinder*, (1965) 141 Ind.App. 42, 211 N.E.2d 502, 507.

If the wrongful act of the defendant is a substantial factor in producing the injury complained of, and if the particular injury suffered by the plaintiff is one of a class that was reasonably foreseeable at the time of the defendant's conduct, then there is a causal relation in fact as well as a legal cause. *Johnson v. Bender, supra,* 369 N.E.2d at 939–940; *Tabor v. Continental Baking Co.*, (1941) 110 Ind.App. 633, 38 N.E.2d 257, 261. The issue of proximate cause is for the jury if different minds might reasonably draw different inferences from the facts. It was for the jury to determine whether the injurious consequences resulting from Orkin's tortious conduct are such as ought reasonably to have been foreseen, or whether an intervening cause was such as to break the causal connection. *Elder v. Fisher*, (1966) 247 Ind. 598, 217 N.E.2d 847, 852; *State v. Edgman*, (1983) Ind.App., 447 N.E.2d 1091, 1099; *School City of Gary v. Claudio*, (1980) Ind.App., 413 N.E.2d 628, 632.

### Quality of Orkin's Wrongful Act

 Orkin argues Hinkley's conduct was nothing more than a noniniquitous human failing, and further points to the fact Hinkley sternly ordered Coleman not to carry the pen gun while on the job. An employer may be held accountable for the wrongful act that his employee committed while acting in his employer's business and within the scope of his employment, although the employer had expressly forbidden it, or the act was done in violation of the employer's rules, orders or instructions. *Pittsburgh, C. & ST.L.R. Co. v. Kirk*, (1885) 102 Ind. 399, 1 N.E. 849; *Eagle*

*Motor Lines, Inc. v. Galloway*, (1981) Ind. App., 426 N.E.2d 1322; *Mock v. Polley*, (1946) 116 Ind.App. 580, 66 N.E.2d 78. Here, Coleman carried the pen gun to protect himself from large dogs while servicing Orkin's customers. He acted within the course and scope of his employment. Orkin may not escape liability by pointing to Hinkley's order to Coleman and its company policy forbidding the carrying of weapons by its employees.[6]

Orkin further argues

The facts of this case, no matter how they are arranged or rearranged, amount to nothing more than, at most, negligence on the part of Orkin. Under no interpretation do the facts reflect conduct for which Orkin should be punished.

It is apparent from the evidence:

(a) Orkin sent an employee known to be dangerous to the Trainas' home,

(b) it failed to take action calculated to relieve Coleman's problem with large dogs, and

(c) it retained Coleman in its employ after acquiring knowledge he was carrying a "zip" gun to protect himself from dogs.

Discussing an automobile case, Miller, J., said

Initially, it is significant that a Court assessing a jury verdict on appeal appropriately looks beyond the facts and circumstances of "the immediate time and place of the accident" to consider the significance of such facts with reference to the "complete course of conduct or misconduct of the host driver preceding the accident." (Citations omitted.) In viewing the total circumstances, our Supreme Court has concluded with reference to an allegedly offending driver:

"To have been guilty either of wilful or wanton misconduct he must have intentionally proceeded with knowledge

---

**6.** Nor does the fact Coleman's injury producing act was merely a negligent one as opposed to intentional change the quality of Orkin's misconduct. It may be of wilful and wanton quality even though the injury producing act was

merely a negligent one. *Go International, Inc. v. Lewis*, (1980, Tex.Civ.App.) 601 S.W.2d 495; *Montgomery Ward and Co. v. Marvin Riggs Co.*, (1979, Tex.Civ.App.) 584 S.W.2d 863, *supra.*

of the peril or his conduct must have shown a conscious indifference upon his part as to whether or not his act would cause injury."

*Hoesel v. Cain*, (1944) 222 Ind. 330, 338, 53 N.E.2d 165, 168. And in *Bedwell v. DeBolt*, (1943) 221 Ind. 600, 605, 50 N.E.2d 875, 878 the Court stated:

> "In determining what constitutes a 'wilful' or 'wanton' act, we subscribe to the view that it is not necessary to prove that defendant deliberately intended to injure the plaintiff; it being sufficient if it is shown that, indifferent to consequences, the defendant intentionally acted in such a way that the natural and probable consequences of his act was injury to the plaintiff."

*Stauffer v. Lothamer*, (1981) Ind.App., 419 N.E.2d 203, 208. These principles apply with equal force to the facts here at issue. Also, see *True Temper Corp. v. Moore*, (1973) 157 Ind.App. 142, 299 N.E.2d 844, and *Jones v. Hernandez*, (1970) 148 Ind. App. 17, 263 N.E.2d 759.

That Coleman had a deep-seated fear of "big loose dogs" is a reasonable inference arising from the evidence. He had talked to Hinkley about the matter on *at least three separate occasions,* twice before Hinkley discovered Coleman with the pen gun. Each time, Hinkley gave Coleman the same advice: either "ignore" such dogs or stay calm and walk toward it with palms open. Coleman had tried that technique and found it did not work after the first time Hinkley so advised him. Clearly, it did not work after the second time Hinkley so advised him. When Hinkley discovered Coleman's pen gun, Coleman reported to Hinkley "they had run me up on top of my truck." In the face of conclusive evidence his advice had not worked for Coleman the two previous times he had given it, Hinkley again took no other affirmative action to assist Coleman with his problem. Hinkley thus Orkin merely gave him the same advice for the third time. In other words, it ignored Coleman's problem after conclusive proof its advice did not work.

The pen or "zip" gun was an illegal, dangerous and deadly weapon with no safety to prevent its firing if mishandled. Hinkley was aware of its potential for injury if Coleman carried it on his rounds. When he ordered Coleman not to carry it, he told Coleman "[a]nything could happen." Orkin failed to discharge Coleman upon discovering the pen gun. Its own policy stated the carrying of a weapon by an employee was ground for immediate discharge of the offender. Had it done so, Coleman never would have entered the Traina household and Charles's injury would not have occurred. However, it chose to retain him in its employ. Having done so, its knowledge of Coleman's long-time, deep-seated fear of large dogs, and its repeated failure to respond to that fear by giving him positive training or furnishing him non-lethal instrumentalities with which to deal with large dogs is evidence which is inconsistent with a hypothesis of mere negligence, etc., under the *Armstrong* rule. It is clear and convincing evidence of wilful and wanton misconduct. Thus, the jury was warranted in awarding punitive damages, even under the rule in *Armstrong*.

█ The Trainas further remind us of the following appellate principles:

> This court's function is *not* to sit as a trial court, but rather to review and correct errors of law and to accept the facts as they are presented so long as probative evidence supports them. (Emphasis in original.)

*Melloh v. Gladis*, (1974) 261 Ind. 647, 309 N.E.2d 433, 440; *Riverside Ins. Co. v. Pedigo*, (1982) Ind.App. 430 N.E.2d 796, 807. The question of whether the injury was caused by wilful and wanton misconduct is left to the jury where conflicting evidence may exist or different inferences may be drawn. *Clouse v. Peden*, (1962) 243 Ind. 390, 186 N.E.2d 1, 5; *Stauffer, supra,* 419 N.E.2d at 210. An appeals court may not reweigh the testimony and substitute its judgment for that of the trial court simply because it feels it might have reached an opposite conclusion had it been the trier of

fact. *Woodard Ins., Inc. v. White*, (1982) Ind., 437 N.E.2d 59, 68. It is the duty of this court to sustain the trial court on any theory supported by the evidence. *Montgomery Ward & Co., Inc. v. Tackett*, (1975) 163 Ind.App. 211, 323 N.E.2d 242, 247.

■■■■■ Punitive damages are awarded not as of right, but as a matter of public policy to punish the wrongdoer and deter the actor and others similarly situated from like conduct. Punitive damages in this case are in the public interest. They tend to deter Orkin and other companies selling or servicing the public in their homes from similar conduct in the future. They make thorough training of employees of such companies in safe practices as they execute their duties a matter of sound economics.

■■■■ The jury's award of punitive damages, even under the rule in *Armstrong* is supported by substantial evidence of probative value. We find no error in this regard.

## II.

### *Issue on Giving of Instruction No. 10 Waived*

■■■ In its brief Orkin sought to challenge the trial court's initial giving of Plaintiff's Tendered Instruction No. 10, as modified, the deleterious effect of which was compounded by the trial court's re-reading thereof to the jury at its request, Orkin claims. However, Orkin did not set out the verbatim objections it made to the trial court. Orkin attempted to summarize them in its brief, but also did not cite us to the record where its verbatim objections could be found. We make this second observation only in light of our Third District's holding in *Stanley v. Johnson*, (1979) Ind.App., 395 N.E.2d 863, where it reviewed the adequacy of an instruction, despite appellant's failure to set out his at-trial objections verbatim.

Ind.Rules of Procedure, Appellate Rule 8.3(A)(7) is mandatory as to what appel-

lant's brief must contain if review of an instruction is sought. It says in part

(7) . . .

When error is predicated on *the giving or refusing* of any instruction, the instruction shall be set out verbatim in the argument section of the brief *with the verbatim objections*, if any, made thereto. Any error alleged in the motion to correct errors not treated as herein directed *shall be deemed* waived." (Emphasis added.)

The issue as to such instruction is waived for its failure to set out its at-trial objections verbatim.

## III.

### *No Need for Re-Trial*

We have reviewed this appeal with *Armstrong's* new clear and convincing evidence standard in mind. We find the trial jury was warranted in assessing punitive damages against Orkin, even under that standard. We believe no reasonable jury would find otherwise. Re-trial in all probability would produce a like result, if one were ordered. The matter was fully exposed to this jury and resolved. There is no need to subject the parties to the additional substantial expense of a re-trial in our opinion.[7]

Finally, there is the matter of judicial economy. A re-trial and review of this same case in a subsequent appeal would be a squandering of both the trial court's and our time. Given the current crush of trial and appellate work, it is a matter of judicial economy to affirm this case without ordering re-trial under the *Armstrong* rule.

Judgment affirmed.

MILLER, J., concurs.

SHIELDS, J. (sitting by designation), dissents with opinion.

SHIELDS, Judge, dissenting.

I dissent.

---

7. In passing we note the record alone consists of 2,228 pages in 11 volumes, numerous depositions, photographs and other demonstrative evidence, obviously prepared at substantial expense to the parties.

The majority affirms the punitive damage judgment even though it holds the *Armstrong*[1] "clear and convincing" evidence rule applies to pure tort punitive damage cases and recognizes the rule has retrospective application under *Don Medow Motors, Inc. v. Grauman*, (1983) Ind.App., 446 N.E.2d 651. Contrary to the majority's affirmance, *Grauman* mandates *at least* a reversal for a new trial on the issue of punitive damages.

As succinctly stated by Judge Staton in *Grauman:*

"[T]here is substantial evidence of probative value from which the jury could have found that Grauman established by clear and convincing proof that punitive damages were recoverable. However, we can not affirm the award of punitive damages because to do so would usurp the function of the trier of fact to weigh the evidence under the standard of clear and convincing proof." (citation omitted) 446 N.E.2d at 655.

Furthermore, I vote to reverse the punitive damage judgment with instructions to enter judgment thereon in favor of Orkin.

It is the position of both Orkin and Trainas that willful *and* wanton tortious misconduct support an award of punitive damages. Assuming, *arguendo*, their position is correct,[2] nevertheless, as a matter of law, the evidence is insufficient to support an award of punitive damages under the standard of preponderance of the evidence, let alone under the standard of clear and convincing proof.

Insofar as the issue involves Orkin's conduct in hiring Coleman as an employee I agree with the majority's conclusion Orkin's conduct failed to rise to the level of willful and wanton misconduct. However, I disagree with the majority's conclusion Orkin's conduct in failing to discharge Coleman upon discovering the pen gun or retaining him in its employ without "giving him positive training or furnishing him nonlethal instrumentalities with which to deal with large dogs" rises to the level of willful and wanton misconduct. Majority opinion at 703.

Willful and wanton conduct is described by our supreme court in *Conder v. Hull Lift Truck, Inc.*, (1982) Ind., 435 N.E.2d 10 as requiring knowledge of an impending danger or consciousness of a course of misconduct calculated to result in probable injury *and* the actor's indifference to the consequences of his conduct. The *Condor* court stresses the probability or likelihood of injury differentiates negligent conduct from willful and wanton misconduct.

The evidence in this case, construed most favorably to the judgment, leads only to the conclusion Orkin did not willfully and wantonly fail to discharge the duty it owed Traina. When Orkin personnel became aware of Coleman's possession of the illegal weapon he was "strongly told not to carry the weapon, it was against company policy. Coleman agreed not to carry the weapon, saying he understood why he should not." Majority opinion at 697. In addition, at that time, Coleman was again told how to conduct himself around a dog.

Conceding[3] Orkin's conduct was negligent, a reasonable fact finder could not conclude this conduct was "of such a nature that under the known existing conditions injury will probably result therefrom." *Mazza v. Kelly*, (1970) 147 Ind. App. 33, 258 N.E.2d 171, 173–74. Rather, the evidence is totally consistent with the hypothesis that Orkin's tortious conduct was the result of an honest error of judgment or some other such noniniquitous human failing. As such, it does not and can not support an award of punitive damages. *Travelers Indemnity Co. v. Armstrong*, (1982) Ind., 442 N.E.2d 349, 362.

1. *Travelers Indemnity Co. v. Armstrong*, (1982) Ind., 442 N.E.2d 349.

2. For a full discussion of the quality of tortious conduct necessary to support a punitive damage award the reader is referred to *Miller Pipeline Corporation v. Broeker*, 460 N.E.2d 177 (Ind. App.1984).

3. Orkin does not appeal the judgment for compensatory damages.

Therefore, I vote to reverse the punitive damages judgment with instructions to enter judgment therein in favor of Orkin. Accordingly, I must also address Trainas' asserted cross-error.

For cross-error Trainas' asserted error is the trial court's refusal of their tendered final instruction no. 9. Specifically, they argue error in the trial court's failure to instruct the jury that: (1) Charles could recover "the loss of enjoyment of his life experienced since the injury, and reasonably certain to be experienced in the future as a result of the injuries," [4] (2) Michelle's loss of consortium damages "may not be susceptible of direct proof, nevertheless, when the facts of such loss are shown by a fair preponderance of the evidence the assessment of the amount of damages must be determined by you in the exercise of your sound judgment and discretion" [5] and (3) Michelle's damages may be assessed "at such sum that you believe and find in your judgment from a preponderance of the evidence ... will fairly and adequately compensate her ... (lost consortium) as a proximate result of the wrongful conduct ... charged ... and ... proven by a fair preponderance of the evidence." [6]

There is no error because the trial court otherwise adequately instructed the jury. Among other factors, the jury was advised it could consider the nature, extent and permanency of Charles's injuries, his physical pain and mental suffering, past and future, his disfigurement and his lost earnings and lost or impaired earning capacity. "Loss of enjoyment of life" is an aspect of or reflected in each and every of the foregoing considerations.

Similarly, the claimed omissions as to Michelle's damage were adequately covered by the trial court's instructions otherwise given to the jury. In the event it found liability, the jury was advised it "must" determine the amount of money which would "fairly" compensate her for her damages resulting from Orkin's negligence and further it should determine the amount from a consideration of the evidence relating to damages. The term "fairly" is sufficient without the use of the further term "adequately". The necessity, if any, of direct proof is an appellate principle used in the review of a judgment. *See Hooper v. Preuss,* (1941) 109 Ind.App. 638, 37 N.E.2d 687.

Because there is no error in refusing to give a tendered instruction if it is otherwise adequately covered, there is no merit to Trainas' asserted cross-error. *Dahlberg v. Ogle,* (1978) 268 Ind. 30, 373 N.E.2d 159.

I vote to reverse the punitive damages judgment and remand this cause to the trial court with instructions to enter judgment thereon in favor of Orkin.

---

**4.** Plaintiffs tendered final instruction no. 9, Record at 598.

